Judge DANIEL L. DYSART.
|tOn February 23, 2014, a jury found defendant, John Cefalu, and his insurer, USAA Casualty Insurance Company, partially liable for the death of Piero Larrea, the son of plaintiff, Miguel Larrea. The jury awarded damages to the plaintiff, and assigned fault to Piero Larrea, John Cefa-lu and his insurer, and to an unknown hit and run driver who struck and killed Pie-ro. The trial court accepted the jury’s verdict and signed a judgment on March 12, 2014. The defendants have suspensively appealed the judgment, arguing that improper jury instructions resulted in the adverse verdict. Plaintiff has answered the appeal seeking a modification or reversal of the judgment with respect to the allocation of fault to the unknown third party. For the reasons that follow, we affirm the jury’s verdict.
*1226 FACTUAL BACKGROUND:
On October 28, 2011, four young men, John Cefalu, John Faust, Stephen Vallette, and Piero Larrea, who were close friends since high school, and Samantha Morgan, a female companion of Vallette, drove from Slidell to New Orleans to celebrate John Cefalu’s birthday. Testimony revealed that although they were driving Cefalu’s vehicle, Larrea insisted on driving into the city. According to | ¡¡Cefalu, Larrea wanted Cefalu to be able to drink alcohol and have a good time for his birthday.
The group began their evening at Pat O’Brien’s in the French Quarter. Although the testimony varied as to exactly what took place during the approximately three hours at Pat O’Brien’s, the consensus was that the group waited in the side bar for a table in the piano bar. After about a half hour, the group gathered at two tables in the piano bar. By this time, four other young ladies, one of whom Cefa-lu identified as someone he was dating, joined the group. Cefalu admitted to drinking two beers while at Pat O’Brien’s. Testimony indicated that John Faust drank three beers during the evening, but that Larrea, Vallette, and Morgan drank more heavily.
The group left Pat O’Brien’s around midnight and walked to a club in Jax Brewery. No one was visibly intoxicated at that point. The group went to the second floor of the club, where Cefalu and his friend, Jessica, and Vallette and Morgan danced. Larrea bought “red” shots and was passing them amongst the group. Cefalu and Faust testified that they did not drink anything other than soft drinks at the club. Cefalu testified that he did not drink for several reasons: he realized he would have to drive home and he had to get up early the next morning; also, Cefa-lu was planning to apply to medical school and knew that a DWI would hamper his chances of being admitted. Faust testified that he did not drink in excess because he suffers from Crohn’s disease.
After a couple of hours, Larrea got into a confrontation with another man when Larrea began dancing with the man’s date. The other man was trying to get his friends to help him fight with Larrea, but Cefalu and Vallette pulled Larrea away and took him downstairs. Cefalu decided it was time to go home and told the ^others to meet him at his car; he accompanied Jessica to her car, then drove it back to Jax Brewery to pick up Jessica’s friend who was intoxicated.
According to Vallette and Faust, Larrea was angry that his friends did not “have his back,” and would not help him fight, the man in the club. When they got in the car, Cefalu was the driver, Faust was in the passenger seat, Larrea was in the back seat behind Cefalu, Vallette was in the middle and Morgan was in the seat behind Faust. As they started for home, everyone was relatively calm; however, once they entered the interstate, Larrea began “acting up.” When Vallette attempted to hand a $20 bill to Faust in the front seat, Larrea grabbed it and it tore in half. He then began shoving and elbowing Vallette, who pushed back. Cefalu yelled at them both to calm down, which they did for a distance. Larrea began insisting that Ce-falu stop the car to allow Larrea and Val-lette to get out and fight. Morgan was struck in the face by either Vallette or Larrea and was crying. At some point before they reached the New Orleans East area, Cefalu was talking on the phone with a female friend, Lisa Loyacano. Ms. Loy-acano testified at trial that she could hear Larrea yelling over the phone. Larrea continued to be disruptive and several times grabbed Cefalu’s arms causing the car to swerve on the interstate. Cefalu threatened Larrea several times with putting him out, which only' made Larrea *1227 more angry and belligerant. As the car was approaching the Irish Bayou exit, Lar-rea again grabbed Cefalu’s arms, causing the car to swerve onto the grassy area on the side of the road. Cefalu was able to gain control and get back to the emergency lane. At that point, he made the decision to make Larrea get out of the car. He pulled over to the emergency lane, told Larrea to get out, which he did, slamming the door and cursing the others. He then walked behind the car into the grassy area on the side of the road as Cefalu drove away.
On the way to Cefalu’s house, Vallette called and texted Larrea repeatedly, but he did not respond. Cefalu testified that he presumed Larrea either would not answer because he was mad, or he had called his brother to pick him up. Cefalu dropped Faust off at his house, and proceeded home with Vallette and Morgan.
Sometime after 4 a.m., Larrea was struck and killed by an unknown hit and run driver not far from the spot where he got out of Cefalu’s car. Early the next morning, Cefalu told his parents what had happened on the way home just hours earlier. As his mother drove to work that morning, she saw the police and emergency vehicles on the eastbound lanes of the interstate. She doubled back to the scene and discovered that Larrea had been killed. She called home and told her husband what had happened. Cefalu, Vallette and Morgan all went to the scene and gave statements to the police.
After an investigation, the police determined that the vehicle which struck and killed Larrea was a Mitsubishi Montero, either a 2006 or 2007 model. Neither the driver nor the vehicle was ever found, despite Larrea’s mother offering a $5000 reward for information. An autopsy determined that Larrea had a blood alcohol content of .16, which is double the legal limit.
PROCEDURAL BACKGROUND:
Following three days of testimony, the jury heard closing arguments, was charged with instructions by the trial judge, and retired to deliberate. The jury awarded $317,000 to plaintiff. It found the decedent, Piero Larrea, 54% at fault for his own death, John Cefalu 28% at fault, and the hit and run driver 18% at fault. The jury did not find that John Cefalu was intoxicated at the time of the incident. On March 12, 2014, the trial court signed a judgment making the jury verdict the judgment of the court. Defendants filed a suspensive appeal, and plaintiff | ¡¡answered the appeal, also seeking modification or reversal of the verdict. Each side claims that improper jury instructions given by the trial court tainted the jury’s verdict.

DISCUSSION:

All assignments of error by defendants in their appeal and plaintiff in his answer to appeal are related to improper or inadequate jury instructions given by the trial court. Louisiana Code of Civil Procedure art. 1792 instructs, in part:
B. After the trial of the case and the presentation of all the evidence and arguments, the court shall instruct the jurors on the law applicable to the cause submitted to them. The court shall reduce such instructions to writing....
In Wooley v. Lucksinger, 09-0571 (La.4/1/11), 61 So.3d 507, the Supreme Court discussed extensively the law relative to jury charges.
La. C.C.P. art. 1792(B) requires a district' judge to instruct the jury on the law applicable to the cause submitted to them. “The trial court is responsible for reducing the possibility of confusing the jury and may exercise the right to decide what law is applicable and what law the trial court deems inappropriate.” Adams v. Rhodia, Inc., 2007-2110 p. 5-6 (La.5/21/08), 983 So.2d 798, 804. Con *1228 sidering the complexity and number of issues for the jury to decide in this case, the district judge determined from the outset she wanted to simplify the instructions and interrogatories for the jury’s consideration. The question here is whether the district judge adequately instructed the jury, as that concept has been defined by this court:
[ajdequate jury instructions are those which fairly and reasonably point out the issues and which provide correct principles of law for the jury to apply to those issues. The trial judge is under no obligation to give any specific jury instructions that may be submitted by either party; the judge must, however, correctly charge the jury. If the trial court omits an applicable, essential legal principle, its instruction does not adequately set forth the issues to be decided by the jury and may constitute reversible error.
Adams, 2007-2110 p. 6, 983 So.2d at 804.
| f,Generally, “the giving of an allegedly erroneous jury instruction will not constitute grounds for reversal unless the instruction is erroneous and the complaining party has been injured or prejudiced thereby.” Rosell, 549 So.2d at 849. In fact, Louisiana jurisprudence is well established that a reviewing court must exercise great restraint before it reverses a jury verdict due to an erroneous jury instruction. Adams, 2007-2110 p. 6, 983 So.2d at 804; Nicholas, 1999-2522 p. 8, 765 So.2d at 1023. We have previously explained the following basis for this rule of law:
[tjrial courts are given broad discretion in formulating jury instructions and a trial court judgment should not be reversed so long as the charge correctly states the substance of the law. The rule of law requiring an appellate court to exercise great restraint before upsetting a jury verdict is based, in part, on respect for the jury determination rendered by citizens chosen from the community who serve a valuable role in the judicial system. We assume a jury will not disregard its sworn duty and be improperly motivated. We assume a jury will render a decision based on the evidence and the totality of the instructions provided by the judge.
Adams, 2007-2110 p. 6, 983 So.2d at 804; see also Nicholas, 1999-2522 p. 8, 765 So.2d at 1023. When a reviewing court finds the jury was erroneously instructed and the error probably contributed to the verdict, an appellate court must set aside the verdict. Adams, 2007-2110 p. 6, 982 [983] So.2d at 804; Nicholas, 1999-2522 p. 8, 765 So.2d at 1023.
In order to determine whether an erroneous jury instruction was given, reviewing courts must assess the targeted portion of the instruction in the context of the entire jury charge “to determine if the charges adequately provide the correct principles of law as applied to the issues framed in the pleadings and the evidence and whether the charges adequately guided the jury in its determination.” Adams, 2007-2110 p. 7, 983 So.2d at 804; Nicholas, 1999-2522 p. 8, 765 So.2d at 1023; Rosell, 549 So.2d at 849. The ultimate inquiry on appeal is whether the jury instructions misled the jury to such an extent that the jurors were prevented from dispensing justice. Adams, 2007-2110 p. 7, 983 So.2d at 804; Nicholas, 1999-2522 p. 8, 765 So.2d at 1023.
The law is clear the review function is not complete once error is found. Prejudice to the complaining party cannot automatically be assumed from the mere fact of an error. Instead, the reviewing court must then compare the degree of *1229 the error with the adequacy of thé jury instructions as a whole and the circumstances of the case. As we found in Adams:
|7the manifest error standard for appellate review may not be ignored unless the jury charges were so incorrect or so inadequate as to preclude the jury from reaching a verdict based on the law and facts. Thus, on appellate review of a jury trial the mere discovery of an error in the judge’s instructions does not of itself justify the appellate court conducting the equivalent of a trial de novo, without first measuring the gravity or degree of error and considering the instructions as a whole and the circumstances of the case. Id., 2007-2110 p. 7-8, 988 So.2d at 805.
Wooley, 09-0571, pp. 81-83, 61 So.3d at 573-575.
In their first assignment of error, defendants argue that the trial court erred in giving an incomplete jury charge. The trial court charged the jury that Cefalu was driving and responsible for the safety, well-being and proper transport of passengers in the vehicle. However, the trial court refused to give defendants’ proposed ■ special charge that “a driver has no special duty to a passenger, even a friend, who because of intoxication becomes belligerent and interferes with the operation of the vehicle.”
In response to defendants’ claim, plaintiff agrees with the general charge given by the trial court, but has answered the appeal arguing that the trial court erred in not given his proposed charge as to Cefa-lu’s additional duty to Larrea.
Defendants argue that because of the incomplete jury charges, the jury was not allowed to decide to whom Cefalu owed the greater duty, i.e., to the three passengers who were not being disruptive, or to Lar-rea, who was intoxicated and physically fighting with another passenger and grabbing Cefalu’s arms, thereby endangering everyone in the vehicle. It is defendants’ position that the charge given confused the jury as it suggested that the duty to one was greater than the duty to all.
To the contrary, plaintiff argues that because Cefalu offered to drive Larrea home, Cefalu had a duty not to increase the risk of harm to Larrea, especially in light of Larrea’s intoxicated state.
In Posecai v. Wal-Mart Stores, Inc., 99-1222 (La.11/30/99), 752 So.2d 762, the Supreme Court explained:
A threshold issue in any negligence action is whether the defendant owed the plaintiff a duty. Whether a duty is owed is a question of law. In deciding whether to impose a duty in a particular case, the court must make a policy decision in light of the unique facts and circumstances presented. The court may consider various moral, social and economic factors, including the fairness of imposing liability; the economic impact on the defendant and on similarly situated parties; the need for an incentive to prevent future harm; the nature of the defendant’s activity; the potential for an unmanageable flow of litigation; the historical development of precedent; and the direction in which society and its institutions are evolving.
752 So.2d at 766 (citations omitted.).
Defendants argue that they proposed two jury charges that would have tempered the effect of the charges given by the trial court. They argue that Cefalu owed a duty to all of his passengers, and that Larrea should not have been subject to a higher duty because of his intoxication. The two charges proposed are as follows:
The driver of an automobile has no special duty to a passenger, even a friend, *1230 who because of intoxication becomes belligerent and interferes with the operation of the vehicle.
The driver of a vehicle has no duty to attempt to restrain an intoxicated passenger from exiting the vehicle even while the vehicle is stopped along an interstate highway at night.
These requested jury charges were derived from the defendants’ reading of Cardella v. Robinson, 39,663 (La.App. 2 Cir. 5/13/05), 903 So.2d 613.
|flWe find Cardella to be factual dissimilar from the facts of this ease, and, therefore, reliance on Cardella is misplaced. In Cardella, an intoxicated driver, Robinson, allowed his intoxicated friend, Wilson, who had attempted to open the door of the moving vehicle, to exit the vehicle on the side of an interstate highway. After Robinson drove away, Wilson walked onto the interstate and was struck and killed by a truck being driven by plaintiff Cardella. Cardella sued Robinson, alleging that Robinson was responsible for the accident because he knew of Wilson’s drunken condition, yet allowed him to exit the vehicle on the interstate. Id., 39-663, p. 1, 903 So.2d at 614.
Robinson and his insurer filed a motion for summary judgment arguing that Robinson had no legal duty to protect Cardella from harm, i.e., to prevent Wilson from walking into the path of Cardella’s truck. They asserted that no special relationship exists between a driver and an adult passenger, even an intoxicated one. The trial court granted the summary judgment and Cardella appealed. Id., 39-663, p. 2, 903 So.2d at 615.
The Court of Appeal found that under the facts of the case, Robinson owed no duty to the decedent. The court found that the decedent wanted to get out of the car; therefore, Robinson had no duty to continue driving against Wilson’s wishes, to prevent Wilson from leaving the vehicle, or to put himself in harm’s way trying to prevent Wilson from entering the interstate. Id., 39,663, p. 8, 903 So.2d at 618.
In the instant case there is no evidence that Larrea asked to exit the vehicle. Rather, Cefalu told Larrea to get out, which Larrea willingly did, slamming the door and cursing his friends.
Plaintiff requested that the trial court give the following special charges:
|inIf you find that John Cefalu knew or should have known that Piero Larrea was intoxicated, he had a duty to avoid affirmative acts which increased the risk of peril to Piero Larrea.
If you find that John Cefalu knew or should have known that by ordering Pie-ro Larrea out of the vehicle, he would be putting Piero Larrea at peril, and that he could have avoided Piero Larrea’s death by the exercise of ordinary or reasonable care (or by the exercise of a greater duty than ordinary care if you so find), then you may find John Cefalu legally at fault for Piero Larrea’s death.
We find that the above charges would have led the jury to believe that Cefalu only had a duty to Larrea, because of his intoxicated state.
The trial court declined to give either party’s requested charges, but rather gave the following special jury charges, which we find instructed the jury sufficiently on the law as it applied to the facts of this casé:
A host driver has a duty to operate his vehicle with reasonable care under the prevailing circumstances for the benefit of guest passengers who might be injured if he fails to do so. At all times pertinent to the events of the evening, John Cefalu was driving and responsible for the safety, well-being and proper transport of passengers in the vehicle. *1231 A driver’s duty to his passengers does not increase or decrease solely because of a passenger’s intoxication. Further, guest passengers also have a duty not to interfere with the driver’s control over the driving mechanism of the vehicle. And, a person who becomes voluntarily intoxicated is held to the same degree of care for his own safety that is required of a sober person.
In Louisiana, the use of any interstate highway by a pedestrian is prohibited and it is unlawful for any pedestrian to cross an interstate highway, except in the case of an emergency. A driver of a vehicle, in which a pedestrian had been riding, does not have a duty to prevent the pedestrian from using or crossing an interstate highway.
_JjjIt is clear from the facts of this case that the events of that evening placed Ce-falu in a difficult position, having to decide whether to put his drunken friend out of the car, or to continue to place his other passengers in harm’s way because of Lar-rea’s actions. In reviewing the jury charges as a whole, we find that the charges given by the trial court were sufficient to inform and guide the jury in its deliberations. In this case, the jury was aware Larrea was intoxicated, and that Cefalu was not only responsible for Lar-rea’s safety, but also that of his other passengers. We find that the charges given on this issue were appropriate to aid the jury in balancing the responsibilities of all involved in this tragic accident.
An appellate court is restrained from reversing a jury verdict as we must assume that a jury will not disregard its sworn duty to reach a verdict based on the evidence and the totality of the instructions given by the judge. See Adams, 2007-2110 p. 6, 988 So.2d at 804.
The second jury charge error argued by defendants is that the judge refused to charge the jury as to La. R.S. 82:321. Specifically, defendants wanted the following charge to be given: “In Louisiana automobiles shall be equipped with multiple head lamps. The high beam shall be aimed and of such intensity to reveal persons and vehicles at a distance of at least 500 feet ahead.” Defendants argue that this charge was appropriate as it pertained to the essential issue of whether or not the phantom driver saw Larrea before striking him, and thus was applicable to the evidence, and constituted a correct principle of law.[1]
We disagree. First, because the driver of the vehicle that struck and killed Larrea was never found, the jury did not hear any evidence of the conditions at the 112time of the accident. There was no testimony about fog, on-coming traffic, cars that might have been ahead of the hit and run vehicle, or any other evidence that would have indicated that the use of high beams was appropriate. Second, La. R.S. 32:322 instructs as to the proper use of high beams, i.e., they should not be used when there is on-coming traffic or when following another vehicle. To give the charge requested, the jury would have to assume that the hit and run vehicle was the only vehicle on the road at the time, as no such evidence was presented.
In their last assignment of error, defendants argue that the trial court erred in failing to give a charge regarding the presumption of fault on the part of a motorist who strikes a pedestrian and then flees the scene.
Plaintiff agrees that the trial court should not have given a charge on the presumption of fault of a hit and run driv *1232 er, as no such presumption exists under Louisiana law.
Defendants proposed the special charge based on prior jurisprudence, Levens v. Commercial Union Ins. Companies, 529 So.2d 871 (La.App. 4th Cir.1988), and Vuillemot v. August J. Claverie & Co., 12 La.App. 236, 125 So. 168 (La.App.Orl.Cir.1929). In Vuillemot, the court reasoned that if the driver of the truck was •keeping a proper lookout, he would have seen the young lady he struck. If he did know he struck a pedestrian and did not stop, then his action in driving away was tantamount to an admission of guilty. Vuillemot, 12 La.App. at 237, 125 So. at 169. In Levens, the court stated that “[i]t has long been a rule in Louisiana that evidence that a driver fled the scene of an accident, knowing that he struck a pedestrian, may be considered as evidence of fault.” Levens, 529 So.2d at 873.
This Court discussed both Vuillemot and Levens in Shroyer v. Grush, 555 So.2d 534 (La.App. 4th Cir.1990). The Court referred to the cases as ancient, but | iswe note that they are still good law. Nonetheless, contrary to defendants’ argument that the older cases jurisprudentially create a presumption of fault of a driver who strikes a pedestrian and leaves the scene, Shroyer accurately stands for the premise that evidence that a driver struck a pedestrian and left the scene may be considered evidence of fault. Id. at 546. We agree with this interpretation, which does not rise to the heightened standard of a presumption.
The evidence presented at trial was that Larrea got out of Cefalu’s vehicle on the shoulder of the road and walked behind the vehicle into the grassy area between the shoulder and the woods. . There is no evidence as to whether the phantom driver had on high beams, low beams or any lights at all. It also was not determined how fast the phantom vehicle was traveling, which would have aided the jury in deciding if the driver had time to stop (relative to the defendants’ argument concerning use of high beams). However, it was within the province of the jury to consider whether the phantom driver knew that he had struck a human being, and intentionally drove away without offering aid or calling for help.
The trial court, over plaintiffs objection, included the phantom driver in the jury interrogatory addressing the comparative fault of the parties. It discussed extensively with counsel prior to charging the jury whether the phantom driver should be included in the jury interrogatories. Following the discussion, the trial court made the decision to include the phantom driver in the comparative fault interrogatory, stating that to not do so would be reversible error. We find no error in that decision. As the jury heard testimony about a phantom vehicle that struck Larrea, causing his death, we find it would have been confusing to the jury not to have the phantom driver included in the interrogatories. Further, not including the | ^instruction did not prejudice defendants’ as the jury ultimately found fault on the part of the phantom driver.
In his answer to appeal, Larrea disagrees with the trial court including the fault of the phantom driver on the jury interrogatory form, and argues that it was error for the jury to allocate fault to the phantom driver. Larrea argues that there was no admissible evidence proving the fault of the phantom driver and, therefore, the fault allocated to the phantom driver should be borne by defendants.
After a thorough review of the record, we find sufficient evidence exists for the jury’s conclusion that the phantom driver was partially at fault for Larrea’s death.
There was evidence presented from which the jury could infer that Larrea was *1233 struck on the shoulder of the road, not in a lane of travel. The plaintiff called NOPD Detective Richard Blackman, who was assigned to the traffic division as a fatality investigator. He was qualified as an expert in accident investigation and reconstruction. Detective Blackman testified that he was called out to the scene by his dispatcher, and found Larrea’s body about one hundred feet from the roadway, with one of his shoes located where the shoulder of the road met the grass. He also found Larrea’s cell phone somewhere between the side of the road and the body. The detective testified that he found blood/ fluid on the highway, which he photographed, but did not submit a sample to determine if the blood was Larrea’s.
Additionally, although plaintiff’s expert could not pinpoint where the impact occurred, he stated that if the blood found on the highway was Larrea’s, then one could assume that the impact took place in either the middle or right hand lane of the highway. However, he also testified that, based on the location of parts of the offending vehicle, Larrea could have been on the shoulder of the road when he was |1sstruck. The jury could infer from the above evidence that the hit and run driver left the lanes of travel and struck Larrea on the side of the road, which would impute fault on the part of the hit and run driver. Therefore, if the jury made the factual finding that Larrea was struck on the shoulder of the road, and because the record contains sufficient evidence for the jury to make that finding, we cannot say that the jury’s allocation of fault to the phantom driver was manifestly erroneous.
It is not this Court’s place to substitute our findings for that of the jury. Rosell v. ESCO, 549 So.2d 840, 844 (La. 1989)( ... if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as trier of fact, it would have weighed the evidence differently.).
Plaintiff cites to Shroyer v. Grush, 555 So.2d at 541, for the proposition that “a motorist driving on a high speed highway at night is not as a matter of law required to see an unlighted and unexpected object in his path in time to come to a safe stop.” Id. at 541. We do not disagree with this premise; however, this argument does not answer the question as to why a driver who hits a pedestrian on a highway does not stop to give aide to that person or to report the accident. Clearly, this fact is also something the jury considered in assigning fault to the hit and run driver.
Accordingly, we find that the charges given to the jury by the trial court were sufficient to instruct the jury on the correct principles of law. We also find that the trial court was correct to include a jury interrogatory as to the fault of the phantom driver. The judgment of the trial court is therefore affirmed.
AFFIRMED.

. Plaintiff, as appellee, agreed with the charge given by the trial court.