SANDRA CABRINA JENKINS, Judge.
11 This is an appeal of a June 2015 judgment by the trial court rendered after a jury verdict in favor of appellee Gloria Chatman and against appellant Southern University at New Orleans (“SUNO”), finding that SUNO was 15 percent at fault for the personal injuries sustained by Ms. *370 Chatman when she was attacked by her roommate and a non-resident minor in an on-campus housing facility in January 2010.
For the reasons that follow, we affirm.
FACTUAL AND PROCEDURAL BACKGROUND
The physical attack that prompted this civil suit — as well as a criminal prosecution of Ms. Chatman’s roommate, Terneisha Sparks-Sanders — occurred on the night of January 18, 2010. The scene of the attack was the two-bedroom, on-campus apartment that Ms. Chatman and Ms. Sanders were leasing from SUNO. Ms. Chatman and Ms. Sanders had been roommates for about one week; they, however, had been best friends for several years. They met in high school, and decided to be roommates.
12At the time of the attack, four people were present in the apartment — Ms. Chat-man; Ms. Sanders; Ms. Sanders’s 16-year-old cousin, Jamisha Sanders; and Ja-misha’s boyfriend, Dale. Jamisha and her boyfriend were visiting Ms. Sanders.
The attack occurred during a heated dispute over missing food that had been purchased earlier in the week. Ms. Chat-man and Ms. Sanders disagree over the details of the fight, which are discussed elsewhere in this opinion. As a result of the attack, Ms. Chatman was seriously injured; she completely lost the use of one of her eyes. For her conduct in the attack, Ms. Sanders was convicted of second degree battery and imprisoned.
In November 2010, Ms. Chatman filed suit against SUNO as the “owner, operator, and manager of the premises at issue in this litigation.” The gist of Ms. Chat-man’s allegations is that SUNO was liable for failing to protect her from being severely injured in a physical attack by not only her own roommate, but also a “non-student/non-resident” of SUNO. Ms. Chatman’s allegations included the following:
• SUNO warranted to her that “there would be on-site security and professional staff members available at the on-campus housing on a daily basis”;
• SUNO permitted a non-student/nonresident to reside in the on-campus apartment in which she was injured;
• SUNO failed to have proper administrative staff, such as residence assistants, on site to prevent non-students from residing in the on-campus apartment; and
• SUNO failed to provide her with the identity of the administrative staff that was available to receive complaints of conduct in violation of on-campus housing policy.
|sMs. Chatman alleged that SUNO’s substandard conduct was the cause-in-fact and the legal cause of her damages.
In January 2010, SUNO opened Phase I of its new Residential Life facility, which had 10 buildings and about 150 students. The facility had a residential life office located a few minutes’ walk from the apartment buildings. Ms. Chatman and Ms. Sanders were among those first 150 housing students. SUNO selected an apartment-style, as opposed to a dormitory-style, design for its on-campus housing facility.
Each of SUNO’s apartment buildings had a community assistant (“CA”), who was a SUNO student and employee, assigned to each building. In SUNO’s housing literature, a CA was described as a “leader and advisor” who “enforce[s] policies to help ensure the safety and well-being of the students.”
When Phase I opened in January 2010, there were 10 CAs living in the apartment *371 complex. At least one CA was on duty each night when the residential life office was closed. The CA on duty had a master key to all the apartments for inspection purposes. The CAs were required to perform security checks .of the buildings and the floors twice- per week. Although SUNO planned to provide its students with the cell-phone numbers and e-mail addresses of its CAs, this plan was not implemented until after the attack on Ms. Chatman. According to SUNO’s housing consultant, the CAs’ cell phone numbers were not given to the students because the CAs had a limited number of minutes on their personal cell phones.
I ¿Visitors were allowed in the apartments subject to the following Residential Housing Rules:

Number of Occupants

The maximum number of people living in an apartment shall be no more than ... two people in a two bedroom apartment. ... Guests staying more than 48 hours without our permission will' be considered unauthorized occupants and you will be in violation of the lease. Visitors
You are responsible for your guests’ compliance with all these Community Policies and parking regulations. Overnight guests are allowed only with the approval of management. Guests who stay after 2:00 a.m. will be considered overnight guests. Guests may stay no more than 48 hours in a row, not to exceed twelve (12) nights in any given semester with prior approval from Management.

Minor Children

Children are prohibited from overnight stay in the apartment. Children who are visiting must be supervised at all times, including balconies, parking lot and common areas. Baby sitting is not allowed in the apartment. [Internal emphasis omitted.]
The Residential Housing Rules also authorized SUNO staff to enter the apartments for the purpose of inspection and when SUNO community policies were violated.
SUNO provided its resident students with the following methods for reporting problems: (1) locating any of the 10 CAs; (2) visiting or calling the residential housing office; (3) flagging down, calling, or-notifying campus police on-line; and (4) calling 911.
On January 10, 2010, Ms'. Chatman and Ms. Sanders moved into their two-bedroom, on-campus apartment. Ms. Chat-man and Ms. Sanders, who were best friends since high school, decided to be roommates. Ms; Chatman testified that when she signed the lease, she was not given any information about the CAs. She testified that no group meetings were held to introduce the students to the CAs. | ¡According to Ms. Chatman, she only coincidentally met the CA assigned to her apartment building,' Robert Fezekas, on the day that she was moving into the apartment. Mr. Fezekas helped her carry her television into her apartment, introduced himself to her as a CA, and told her that his apartment was directly above her apartment.
During her first week in the apartment, Ms. Chatman did not spend the night at the apartment; she spent the night elsewhere with her boyfriend. During that week, Ms. Sanders had multiple visitors at the apartment. According to Ms. Chat-man, Ms. Sanders’s visitors included -Ms. Sanders’s boyfriend; her boyfriend’s aunt; the aunt’s two minor children; Ms. Sanders’s three-year-old child; Jamisha (Ms. Sanders’s 16-year-old cousin); and Jami-sha’s boyfriend. Ms. - Sanders acknowledged that she understood - that guests *372 were to register if they spent the night. She also acknowledged that Jamisha and her boyfriend spent the night at the apartment and that she never registered them.
On the afternoon of Thursday, January 14, 2010, Ms. Chatman, Ms. Sanders, and Jamisha went to a Wal-Mart together to buy food and supplies for the apartment. When they returned to the apartment, Ja-misha carried her suitcase into the apartment. ' Because Jamisha was a minor, and not a university student, Ms. Chatman was concerned that Jamisha spending the night was in violation of the university’s rules against overnight- visitors. She also was concerned that this violation might cause them to be thrown out of the apartment. To avoid conflict, Ms.. Chatman did not raise this issue with either Ms. Sanders or Jamisha. Instead, Ms. Chatman went to Mr. Fezekas’s apartment to discuss the problem. Mr, Fezekas, however, did not answer the door.
|fiOn the following night, which was a Friday, Ms. Sanders’s boyfriend came to the, apartment and began banging on the windows and door. Ms. Sanders hid in the bathroom. According to Ms. Chatman, both she and Ms. Sanders were scared. Later that night, Ms. Chatman again went upstairs to see the CA, Mr. Fezekas. She planned to tell him that she “was in an uncomfortable situation” due to her roommate’s boyfriend “running around the apartment” and banging on the door coupled with her roommate’s minor cousin Jamisha, who Ms. Chatman “barely [felt] safe around,” staying in the apartment. Once more, Mr. Fezekas was not there.
On Saturday, January 16, 2010, Ms. Chatman went home to spend 'the Martin Luther King Day weekend with her mother and family. On that Sunday morning, Ms. Chatman and her mother returned to the apartment briefly to pick up some paperwork that Ms, Chatman needed to apply for an internship. ■ According to Ms. Chatman, when they arrived they found' that the front door was unlocked, and that Jamisha and her boyfriend were in bed under one of Ms. Chatman’s blankets. Ms. Chatman said that “[flood was all over the counter.” Ms. Sanders was not present in the apartment. Although Ms. Chat-man felt this situation - presented safety concerns, she did not address her concerns with Jamisha or her boyfriend to avoid conflict." Instead, Ms. Chatman retrieved her paperwork and returned to the car. She had a discussion with her mother, and they went home.
At about 5:00 p.m. dn Monday, January 18, 2010, MLK Day, Ms. Chatman’s mother brought her back to the apartment to stay. When they arrived, no one was there. They found that the apartment was filthy, and that Ms. Sanders and her visitors had eaten most of the food and snacks that Ms. Chatman had purchased at Wal-Mart. She and her mother planned to go to the residential life Loffice the next day to complain. Ms. Chatman removed the remaining items that did not need refrigeration into her bedroom, and her mother went home. Ms. Chatman locked the front door of her bedroom.
A few hours after Ms. Chatman’s mother left, Ms. Sanders, Jamisha, and Jami-sha’s boyfriend arrived at the apartment. Jamisha questioned Ms. Chatman regarding whether she had taken her Snickers candy bars that she purchased at Wal-Mart, which Ms. Chatman denied. Ms. Sanders then questioned Ms. Chatman about the whereabouts of other missing food. Ms. Chatman responded — which she admitted was untruthful — that she had given the missing food to her mother to take home. Because she was able to see the missing food visible in Ms. Chatman’s room, Ms. Sanders became ■ upset. Ms. Sanders then momentarily left Ms. Chat- *373 man’s bedroom, went into the kitchen and instructed Jamisha to “go punch [Ms. Chatman] in the face.” Ms. Sanders explained that the reason she told Jamisha to do that was because Ms. Chatman had removed from the kitchen not only her own stuff, but the stuff she and Jamisha had purchased.
The attack occurred between 9:00 and 10:00 p.m. Jamisha, followed by Ms. Sanders, entered Ms. Chatman’s bedroom without permission through the adjoining bathroom. After entering the room, Jamisha, following Ms. Sanders’s orders, attacked Ms. Chatman. The details of the attack are disputed.
According to Ms. Sanders, she was a mere spectator. She acknowledged that she was present in Ms. Chatman’s bedroom during the entire attack. She testified that' she never participated in the attack by Jamisha against Ms. Chatman. Ms. Sanders denied ever touching Ms. Chatman. She also denied wearing high heel shoes that night. She admitted that she left Ms. Chatman in the apartment alone after the fight, but she denied taking Ms. Chatman’s cell phone.
| sAccording to Ms. Chatman, Jamisha hit her first. Ms. Chatman fought back .by grabbing Jamisha’s hair. Ms. Sanders then joined in the attack, hitting Ms. Chat-man. The trio then wrestled on the bed, where Ms., Chatman was sitting watching television. Ms.- Sanders and' Jamisha dragged Ms, Chatman off her bed and threw her against the television. Once Ms. Chatman was on the floor, Jamisha began to attack Ms. Chatman’s lower body. At the same time, ¡ Ms. Sanders, who was wearing high heel stiletto shoes, kicked and stomped Ms. Chatman’s head, face, and, in particular, her eyes. Ms. Chatman testified that she was certain that it was Ms. .Sanders who stomped her in the face and eyes. She also noted that while Ms. Sanders was wearing high heels, Jamisha was wearing flat baby doll slippers.
After the attack, Ms. Chatman attempted to retrieve her cell phone to call her mother for help. Ms. Sanders told Jami-sha to take the phone, and Jámishá complied. Not only did Ms. Sanders and Ja-misha fail to provide first aid to Ms. Chatman, but Ms. Sanders also told' Ms. Chatman to just put some peroxide on her face. Ms,- Sanders then packed up all of her possessions and left the apartment along with-Jamisha and Jamisha’s boyfriend. Ms. Chatman, who then was alone in the apartment, became unconscious. She remained unconscious for about forty-five minutes. When she regained consciousness, she sought assistance' from the CA who lived upstairs, Mr. Fezekas.
Mr.' Fezekas was the first person who saw Ms. Chatman after the attack. He explained that he was standing on his balcony smoking a cigarette when he spotted her out in the courtyard area below him with her hands on her face. He went downstairs to her and asked her what happened. Ms. Chatman told Ms. Fezekas that her roommates — suggesting multiple people — jumped her. Ms. Chatman used Mr. Fezekas’s cell phone to call her mother. He took her upstairs to his apartment. UHe called Coach Mike Riley, who resided in the building and was a night supervisor. They then called campus police and EMS.
Coach Riley, who responded to the call from Mr. Fezekas, testified that Ms. Chat-man told him that she and her roommate had a disagreement about food. She also told Coach Riley that Jamisha and Ms, Sanders had taken her cell phone. Ms. Chatman used Coach Riley’s cell phone to call her sister. Coach Riley testified that except for some hangers none of Ms. Sand *374 ers’s belongings were left in the apartment. .
Similarly, SUNO police officer Sabrina Baily, who was the only police officer patrolling the entire campus that night, testified that she responded to the call from Mr. Fezekas, which came in after midnight. According to Officer Bailas police report, the attack was over missing food. Officer Baily noted in her report that “[Ms.] Chatman stated that her roommate (Terneisha Sanders) were having problems earlier in the week but she left for the weekend and thought everything had calmed down.”
EMS and the New Orleans Police Department also responded to the scene. Ms. Chatman was taken by ambulance to the hospital. Despite numerous surgeries, she totally lost one of her eyes. Both Ms. Sanders and Jamisha were arrested. Ms. Sanders was criminally prosecuted for second degree assault, convicted, and sentenced to imprisonment.
In Ms. Chatman’s civil suit, SUNO filed a motion for summary judgment, which was denied. In May 2015, a jury trial was held. At the close of Ms. Chatman’s case, SUNO moved for a directed verdict, which was denied. At the close of the case, the jury answered affirmatively the jury interrogatories regarding SUNO as follows:
|1fll. Do you find that [SUNO] was at fault for the attack of January 18, 2010?
2. If you have found that [SUNO] was at fault, do you find that [SUNO’s] fault was a cause-in-fact of Gloria Chatman’s injury”
The jury likewise answered the same two interrogatories affirmatively as to Ms. Sanders and Jamisha, both non-parties. The jury then allocated fault as follows: SUNO 15 percent; Ms. Sanders 70 percent; and Jamisha 15 percent. The jury found Ms. Chatman free from fault. The jury awarded a total of $1,055,000 in damages. After taking into account the jury’s allocation of fault, the trial court rendered a judgment in favor of Ms. Chatman and against SUNO in the amount of $158,250, which included general damages of $120,000; past medical expenses of $15,000; and future medical expenses of $23,250. The trial court assessed SUNO with costs. This appeal followed.
DISCUSSION
On appeal, SUNO raises three assignments of error: (1) the trial court erred in casting SUNO in judgment because SUNO owed no legal duty to protect Ms. Chat-man from such an unforeseeable criminal attack; (2) the trial court erred in failing to rule on the issue of legal cause, or alternatively, to properly instruct the jury on the issue of legal cause; and (3) the trial court erred in assessing costs against SUNO.
We first discuss whether the trial court improperly allowed the jury to decide the issue of legal cause.
The duty-risk analysis is the standard negligence analysis employed in determining whether to impose liability under La. Civ. Code art. 2315. Lemann v. Essen Lane Daiquiris, Inc., 05-1095, p. 7 (La.3/10/06), 923 So.2d 627, 632-33. A plaintiff must prove five elements: (1) the defendant had a duty to conform his Inconduct to a specific standard (the duty element); (2) the defendant’s conduct failed to conform to the appropriate standard (the breach element); (3) the defendant’s substandard conduct was a cause in fact of the plaintiffs injuries (the cause-in-fact ■ element); (4) the defendant’s substandard conduct was a legal cause of the plaintiffs injuries (the scope of liability or scope of protection element); and (5) the actual damages (the damages element). Id. at p. 7, 923 So.2d at 633. A negative *375 answer to any of the inquiries of the duty-risk analysis results in a determination of no liability. Id.
SUMO argues that the fourth element, known as “legal cause,” “scope of liability,” or “scope of protection,” is a legal question to be decided by the court, and not a factual issue for the jury.
Although for years the issue of whether legal cause was a fact issue or a legal issue “baffled scholars and courts,”[1] in Parents of Minor Child v. Charlet, 13-2879, p. 6 (La.4/4/14), 135 So.3d 1177, 1181, the Louisiana Supreme Court confirmed that legal cause is a mixed question of law and fact for the jury (or other fact-finder) to decide. Thus, we find no error in the trial court’s decision to submit the question of legal cause to the jury.
We now address whether the trial court adequately instructed the jury on the-element of “legal cause.”
As an'initial matter, Ms. Chatman argues that SUNO did not timely object to the trial court’s refusal to adopt its proposed jury charge on legal cause.
A month before trial, SUNO submitted a special jury instruction on legal cause. In a footnote, SUNO stated that,it,believed that the trial court should |1?decide the issue of legal cause, and not the jury. The footnote further stated that, in the event that the court disagreed, the court should adopt SUNO’s proposed jury instruction on legal cause.
At the jury charge conference in the middle of trial, the trial court decided that legal cause was a legal question for the court, and not for the jury. The parties agreed. More than an hour after jury deliberations began, the trial court summoned counsel for a conference, and ruled for the first time that legal cause was not a question of law for the court to decide, but a question of fact for the jury. The trial court concluded that its standard jury instructions would adequately convey to the jury the concept of legal cause between the defendant’s conduct and the plaintiffs injury. The trial court found that SUNO’s proposed instruction on legal cause was “very confusing.”
SUNO immediately objected orally, and later in writing, to the jury instruction on legal cause, arguing that the instruction was erroneous because it did not use the term “ease of association.” The trial court stated that SUNO’s objection was “not new” and was “preserved” in the footnote in SUNO’s proposed jury instruction on legal cause. We agree.
As for the adequacy of the trial court’s jury instruction on legal cause, La. Code Civ. P. art. 1792(B) requires the trial court to instruct the jury on the law applicable to the cause submitted to them. “The trial court is responsible for reducing the possibility of-confusing the, jury and may exercise the right to decide what law is applicable' and what láw the trial court deems appropriate.” Adams v. Rhodia, Inc., 07-2110, pp. 5-6 (La.5/21/08), 983 So.2d 798, 804.
“Adequate jury instructions are those which fairly and reasonably point out the issues and which provide correct principles of the law for the jury to apply to 11Rthose issues.” Adams, 07-2110 at p. 6, 983 So.2d at 804. “If the trial court omits an applicable, essential legal principle, its instruction does not adequately set forth the issues to be decided by the jury and may constitute reversible error.” Id.
*376 Trial courts are given broad discretion in formulating jury instructions. Larrea v. Cefalu, 14-0607, p. 6 (La.App. 4 Cir. 3/25/15), 162 So.3d 1224, 1228. The mere discovery of an error in the trial court’s instructions does not itself justify reversal. Wooley v. Lucksinger, 09-0571, p. 82, 61 So.3d 507, 574. The reviewing court must compare the degree of error with the adequacy, of the jury instructions as a whole and the circumstances of each case. Adams, 07-2110 at p. 7, 983 So.2d at 804. The ultimate inquiry on appeal is whether the jury instructions misled the jury to such an extent that the jurors were prevented from dispensing justice. Id. Accordingly, an appellate court must exercise great restraint before' it reverses a jury verdict because of erroneous jury instructions. Id.
The trial court , used its standard jury instructions on negligence, which state that the plaintiff must prove:
-One, that the injury which she says she suffered whs caused in whole or in part by the conduct of the defendant; two, that the conduct of the defendant was below the standards which I have told you are applicable to the defendant’s conduct; and-three, that there, was damage to the plaintiffs person or property.... To sum up this part, to find that the defendant’s conduct is substandard, you must find that an ordinarily prudent person under all of the surrounding circumstances would reasonably have foreseen that as a result of its conduct, some such injury as the plaintiff suffered would occur, and that defendant failed to do what an ordinarily prudent person would have done. You may find it helpful to ask yourself: “How would an ordinary prudent person have acted or what precautions would they have taken if faced with similar conditions or circumstances?” [Emphasis added.][2]
|uThe trial court also instructed the jury that it must decide:
[w]hether the defendant’s conduct was below the standard applicable to its activity. ... In this case, the basic standard is that the defendant must exercise the degree of care that we might expect from an ordinarily prudent person'under the same or similar circumstance.... A reasonably prudent person will avoid creating an unreasonable risk of harm. In deciding whether the defendant violated this standard of conduct, you may weigh the likelihood that someone might have been injured by its conduct and the seriousness of that injury if it should occur against the importance to the community of what the defendant was doing and the advisability of the way it was doing it under the circumstances. [Emphasis added.][3]
The trial court also told the jury that “when you think about- my instructions, consider them together, : Don’t single out any individual sentence, or idea and ignore the others.”
SUMO argues that the trial court’s jury instructions on negligence improperly addressed only the elements of “duty” and “breach of duty,” without instructing the jury on the essential element of “legal cause.” SUNO also argues that the trial court improperly combined the cause-in- *377 fact and legal cause inquiries into one question.
SUNO contends that the trial court should have used its proposed special instruction regarding legal cause:- ‘
I’ve told you earlier that, for Southern to be liable to Chatman, you would have to conclude that Southern’s conduct was sub-standard in relation, to the rule which applies to its conduct (a reasonably prudent person under the circumstances) and that Southern’s conduct must have played a substantial part in causing Chatman’s injury. But there is a further finding necessary in order "for you to render a verdict for the plaintiff. You must also consider whether a reasonable person, in doing or contemplating the acts or omissions which Southern is charged, would have considered the general kind of injury as that suffered in this case as one of the dangers created or enhanced by its conduct. In other words, do you think that the standard Inapplicable to Southern’s conduct was meant to cover what happened to this plaintiff? [Emphasis added.]
“Rules of conduct are designed to protect some persons under some circumstances against some risks.” Washington v. Gusman, 15-0177, pp. 19-20 (La.App. 4 Cir. 10/14/15), 183 So.3d 510, 526. Although there is no “rule” for determining the scope of a duty, the pertinent inquiry is a question of policy as to whether the particular risk of harm encountered by the plaintiff should fall with the scope of the duty owed by the defendant. Roberts v. Benoit, 605 So.2d 1032, 1044 (La.1991). Louisiana courts often phrase the idea of legal cause or scope of duty in terms of the “ease of association,” which melds policy and foreseeability into one inquiry: “‘Is the harm which befell the plaintiff easily associated with the type of conduct engaged in by the defendant?’” Jones v. Buck Kreihs Marine Repair, 13-0083, p. 7 (La.App. 4 Cir. 8/21/13), 122 So.3d 1181, 1186.
The trial court’s jury instruction'on legal cause closely tracks the language of the defendant’s, proposed jury instruction in Chaisson v. Avondale Indus., Inc., 05-1511, pp. 27-28 (La.App. 4 Cir. 12/20/06), 947 So.2d 171, 190:
In order to find the defendant’s conduct substandard, you must also determine whether a reasonable person under all circumstances surrounding his conduct, would have reasonably foreseen as a result of his conduct, some such injury as [plaintiff] suffered, and you must also find that it failed to exercise reasonable carp to avoid the injury. In other words, do you think that the standard applicable to defendant’s conduct was meant, to cover what happened to [plaintiff]., ...
■The Chaisson■ court did not find legal error in. this .instruction. Instead, the appellate court found that the “main tenets’’ of this specific “foreseeability” charge were “subsumed into the actual jury charge,” which instructed the jury to find negligence if the defendant, based on the facts and circumstances that existed at the j^time the.incident occurred,.acted as a reasonable and prudent person. Id. at p. 29, 947 So.2d at 190-91.
Even though the trial court’s jury instruction in this case does not use. the specific phrase “ease of association,” the elements of cause-in-fact and legal cause/ scope of protection are plainly separate inquiries.- The jury charge properly asks the jury to decide whether the particular risk of harm encountered by Ms. Chatman fell within the scope of the duty of protection owed by-SUNO to its resident students, based upon policy considerations such as the likelihood , and severity of the *378 injury. Notably, SUNO’s own proposed jury instruction on legal cause also does not use the phrase “ease of association,” which SUNO now argues is essential to the jury’s understanding on the law concerning legal cause.
We find that the trial court’s instructions as a whole fairly and reasonably described the legal cause issue and provided the correct principles of law for the jury to apply to that issue. Adams, 07-2110 at p. 6, 983 So.2d at 804. The jury instructions, therefore, could not have misled the jury to such an extent that the jurors, were prevented from dispensing justice. Id. at p. 7, 983 So.2d at 804.
SUNO also argues that the trial court erred in failing to include a specific jury interrogatory on “legal cause” on the jury verdict form, asking only whether SUNO was “at fault.” Unlike the jury instructions, SUNO did not ask for a special written question on legal fault, to be given to the jury only if the court disagreed with SUNO’s position that legal cause was an issue for the court to decide. See La. Code Civ. P. art. 1812(C). SUNO was given a reasonable opportunity to object to the verdict form, and its failure to timely object to the omission of a jury interrogatory on- legal cause constitutes waiver of that objection on appeal. Price v. La. Dept. of Transp. & Dev., 608 So.2d 203, 210 (La.App. 4th Cir.1992).
|17We now address SUNO’s argument that the trial court erred in casting SUNO in judgment because SUNO owed no legal duty to protect Ms. Chatman from an unforeseeable criminal attack. Although SUNO also argues that it owed no “legal duty” to Ms. Chatman, this argument is actually a challenge to the fact-specific “legal cause” element of negligence. A “no duty” defense “generally applies when there is a categorical rule excluding liability as to whole categories of claimants or of claims under-any circumstances.” Pitre v. La. Tech Univ., 95-1466, p. 22 (La.5/10/96), 673 So.2d 585, 596 (Lemmon, J., concurring). We find that the “no duty” defense is not available in this case.
We must therefore decide whether there is an “ease of association” between SUNO’s housing policies that restrict visits by non-resident, minor guests and the risk of a violent physical attack such as that experienced by Ms. Chatman in her on-campus apartment.
Because legal cause is a mixed question of law and fact, it should be reviewed on appeal under the manifest error standard. Harold A. Asher, CPA, LLC v. Haik, 12-0771, p. 5 (La.App. 4 Cir. 4/10/13), 116 So.3d 720, 724. . Before an appellate court may reverse a fact-finder’s determination of fact, it must review the record in its entirety and: (1) find that a reasonable factual basis does not exist for the finding; and (2) further determine that the record establishes that the fact-finder is clearly wrong or manifestly erroneous. Mazzini v. Strathman, 13-0555, p. 4 (La. App. 4 Cir. 4/16/14), 140 So.3d 253, 256. As long as the trier of fact’s findings are reasonable in light of the record as a whole, the appellate court will affirm. Id.
In this case, SUNO’s legal duty was properly set forth in the trial court’s instructions to the jury on the general duties owed by a university to its students:
| ^Universities have a duty to provide a safe campus and to act with a reasonable regard for the students’ safety. The presence of a security guard in a position where he can be seen by potential criminals has a deterrent effect on criminal activity in the area. Although a university also has a duty to implement reasonable measures to protect its students on the premises ■ from criminal *379 acts, those criminal acts must be foreseeable.... Universities do-not stand in loco parentis — in the place of parents— to their students. Attempts to foster the educational process and the growth and maturation of the students have relieved universities of many of their protective duties. Modem college students are considered adults capable of protecting their own interests. They demand and receive increased autonomy and decreased regulation both on and off campus.
See Williams v. State of La., 34,691, p. 6 (La.App. 2 Cir. 5/9/01), 786 So.2d 927, 932 (university has a duty to implement reasonable measures to protect the students in its dormitory rooms from foreseeable criminal acts); Boyd v. Cebalo, 15-1085, p. 5 (La.App. 4 Cir. 3/16/16), 191 So.3d 59, 61 (recognizing that “a third-party’s criminal activity does not grant the university absolute immunity from liability” and “if the facts of a case prove the criminal activity was foreseeable, the university may have a duty to protect or warn students”); Robertson v. State Through Dept. of Planning & Control, 32,309, p. 14 (La.App. 2 Cir. 12/10/99), 747 So.2d 1276, 1284 (recognizing the duty of a university to provide a safe campus); Fox v. Bd. of Supervisors of La. State Univ., 576 So.2d 978, 982 (La. 1991) (although at one time universities stood in loco parentis to their students which created a special relationship that imposed a duty on the college to exercise control over student conduct, in modern times there has been evolved a departure from the in loco • parentis relationship); Pitre v. La. Tech. Univ., 95-1466, p. 21 (La.5/10/96), 673 So.2d 585, 595 (acknowledging that universities no longer stand in loco parentis to their students, and that attempts to foster the educational process,- and the growth and maturation of students, has relieved universities of many of their protective duties).
11flThe legal cause or “scope of protection”- inquiry assumes that a legal duty exists and questions whether the injury suffered by the plaintiff is one of the risks encompassed- by the rule of law that imposed the duty. Chaisson, 05-1511 at p. 24, 947 So.2d at 178. The extent of protection owed to a particular plaintiff is determined on a case-by-case basis to avoid making a defendant an insurer of all persons against all harms. Todd v. State Through Dept. of Soc. Servs., 96-3090, p. 7 (La.9/9/97), 699 So.2d 35, 39. In determining the limitation to be placed on liability for a defendant’s substandard conduct, the proper inquiry is often how easily the risk of injury to the plaintiff can be associated with the duty sought to be enforced. Faucheaux v. Terrebonne Consol. Gov’t, 615 So.2d 289, 294 (La.1993). Thus, a risk may be found not within the scope of a duty where the circumstances of that injury to the plaintiff could not reasonably be foreseen or anticipated, because there was no ease of association between the risk of injury and the legal duty. Lazard v. Foti, 02-2888, p. 6 (La.10/21/03), 859 So.2d 656, 661.
In the few days leading up to the attack, various non-students were coming in and out of the apartment, causing a safety concern for Ms. Chatman. In particular, Ms. Sanders brought her cousin, Jamisha, a minor child and a non-student at SUNO, to the apartment. Jamisha brought a suitcase and began staying overnight, as if she was residing in the unit. Because this was a violation of SUNO’s housing rules, Ms. Chatman became justifiably concerned that this could have put them “out of the apartment.”
During this time period, other incidents occurred. One night, Ms. Sanders’s boyfriend came to the apartment, “knocking like he was crazy,” “banging on the win *380 dows” and “trying to get her to open the door,” while Ms. Sanders hid in the bathroom. During the entire long weekend before the attack,' two non-rstudents— | gn16-year-old Jamisha and her boyfriend — were living at the apartment, sleeping in Ms. Chatman’s blankets, leaving the door unlocked, and generally disrupting the apartment. Due to the rapidly escalating safety issues, Ms. Chatman tried to get help from SUNO. SUNO, however, never told Ms. Chatman who the assigned CA was for her apartment building; she only coincidentally met Mr. Feze-kas when she was moving in. Several times during those few early days, Ms. Chatman tried to report her safety concerns to Mr. Fezekas who, dismayingly, didn’t even know that he was the designated CA for Ms. Chatman’s (and his) building. Even though SUNO’s rules stated that CÁs “[m]ust be available via land line or cell phone and university email daily,” Ms. Chatman was never given Mr, Feze-kas’s cell or apartment phone numbers or his e-mail address. SUNO did not give the CAs’ cell phone numbers to any of its housing students because,' astonishingly, the CAs had “limited minutes on their [personal] cell phone[s].” Ms. Chatman knocked on Mr. Fezekas’s apartment door several times to complain, and no one answered. Ms. Chatman also tried to report her safety worries to the residential life office, but the office was closed.
Ira Thomas, ,who was employed as SUNO’s chief of police at the time of the attack, testified that in January 2010 SUNO had only one police officer patrolling the entire campus on nights and weekends, and that SUÑO did not have the manpower to provide 24-hour police security at the housing facility. Campus police officer Baily testified that on her night shifts (between 10:00 p.m. and 6:00 a.m.) she patrolled the entire campus by car only, and that she would simply “drive through the parking lots.” Officer Baily testified that Ms. Chatman’s building was not near a parking lot, so that her vehicular patrols would never have passed Ms. Chatman’s apartment.
|21It is clear, therefore, that the CAs’ availability to the resident students, and the CAs’ obligation to “vigilantly” enforce SUNO’s written policies strictly limiting visits by non-residents and minors, were a crucial part of SUNO’s plan to ensure the safety and security of its students living in on-campus housing. As discussed above, the evidence makes clear that SUNO failed to ensure that the CAs were always available to help SUNO students with safety and security problems. Although the CA who lived in Ms. Chatman’s building knew that he was responsible for enforcing SUNO’s written housing policies, he never inspected the building to make certain that no unauthorized visitors were staying in any of the apartments. Plainly, SUNO also was unreasonably lax in the enforcement of its written policies, which were intended to protect its students from risks of harm posed by unauthorized persons present in the apartments.
SUNO argues that the risk of a sudden attack by Ms. Chatman’s hand-picked roommate and-best friend, during a dispute over missing food, was not foreseeable or easily associated with SUNO’s duty to protect its students from physical attacks by third parties inside campus housing. SUNO tries to diminish or even negate the very significant role played by 16-year-old non-student/non-resident Jami-sha, who had been living in the apartment with her boyfriend without authorization for at least four days prior to the attack, in obvious violation of SUNO’s visitor policies. Ms. Chatman was already frightened of Jamisha. Although Ms. Chatman’s front door to her bedroom was locked, Jernisha, closely followed by Ms. Sanders, *381 stormed into Ms. Chatman’s bedroom through an adjoining bathroom without permission. Jamisha viciously attacked Ms. Chatman over something as trivial as ■ a Snickers candy bar. Jamisha was the first person to strike Ms. Chatman while she was relaxing on her bed, Jamisha and Ms. Sanders both grabbed Ms. ^Chatman’s1 arm's, dragged Ms. Chatman off the bed, and “rammed” her into the television. While Ms; Chatman was lying on the floor, Jamisha began attacking Ms. Chatman’s lower body, presumably holding her down while • Ms. • Sanders repeatedly stomped on Ms.-Chatman’s head and face with' a stiletto heel, destroying Ms; Chat-man’s eye. Because Ms. Chatman “didn’t have the strength to fight back,” Jamisha also stole Ms. Chatman’s cell phone. Ja-misha did not offer Ms. Chatman any first aid or other help, but quickly left the apartment with her • boyfriend. Even though Jamisha did not physically stomp out Ms. Chatman’s eye, Jamisha was a willing and active instigator and participant in the.attack which resulted in Ms. Chatman’s devastating injuries.. The jury confirmed so by allocating 15 percent of the fault to Jamisha.
Ms. Chatman suffered a brutal criminal attack by the precise sort of person — a non-student, non-resident minor — whose SUNO’s rules and policies were intended to bar from campus housing without prior authorization. SUNO’s policies that guar-antée its students 24-hour access to housing staff, who are responsible for enforcing SUNO’s safety and visitation rules, were intended to prevent the risk of criminal behavior by such persons. We conclude that the risk of a vicious physical attack on Ms. Chatman by a non-student minor who was not authorized to be present in the apartment is easily associated with SUNO’s duty to ensure the safety of its students who live in .SUNO’s on-campus housing. The jury, therefore, did not manifestly err in finding that Ms. Chatman proved the element of legal cause.
Finally, because we affirm the judgment in favor of Ms, Chatman, we do not address SUNO’s argument that the trial court’s award of costs should be reversed if the judgment is reversed.
^CONCLUSION
For the reasons assigned, we affirm, in all respects the trial court’s judgment rendered in accordance with the jury’s verdict in favor of Ms. Chatman and against SUMO.
AFFIRMED
LOVE, J., Concurs With Reasons.
TOBIAS, J., Dissents and Assigns Reasons.
LEDET, J., Dissents With Reasons.

. See Perkins v. Entergy Corp., 98-2081, p. 34 (La.App. 1 Cir. 12/28/99), 756 So.2d 388, 412 n. 52.

. The trial court's description of the three elements. of negligence are taken verbatim from Louisiana Supreme Court Rule 44, Part R, which sets forth mandatory general civil jury instructions, effective October 15, 2014.

. This language is also taken verbatim from the Louisiana Supreme Court Rule 44 pattern jury instructions.