832 So.2d 1052 (2002)
Michael S. RAYBORN
v.
DIAMOND OFFSHORE COMPANY and Walter Oil & Gas Corporation
No. 2002-CA-0084.
Court of Appeal of Louisiana, Fourth Circuit.
November 13, 2002.
*1053 Timothy J. Young, Robert J. Young, Jr., Young, Richaud & Myers, New Orleans, Counsel for Plaintiff/Appellee.
Nelson W. Wagar, III, Jason P. Foote, Chopin, Wagar, Cole, Richard, Reboul & Kutcher, LLP, Metairie, Counsel for Defendant/Appellant.
(Court composed of Chief Judge WILLIAM H. BYRNES III, Judge TERRI F. LOVE, Judge MAX N. TOBIAS, Jr.)
LOVE, J.
This case involves an accident on a Diamond Offshore Company rig, where Michael *1054 Rayborn was hit in the face and eyes with hydraulic fluid from a hose that burst near where he was working. Michael Rayborn filed suit against Diamond Offshore Company and Walter Oil and Gas Corporation, to determine the amount of damages for the injury to his right eye. The jury awarded Michael Rayborn $829,000 in general damages, $46,000 in past lost wages, and $125,000 in future lost earnings/earning capacity. For the following reasons, we amend the judgment and affirm as amended.
FACTS AND PROCEDURAL HISTORY
On September 16, 1998, Michael Rayborn ("Rayborn") was employed by Diamond Offshore Company ("Diamond") as a floor hand aboard the MODU OCEAN TOWER. Rayborn was injured when a hose containing hydraulic fluid ruptured, spraying him in the face and eyes. He filed this action against the defendants, Diamond, and Walter Oil and Gas Corporation, the owner of the offshore lease.
Rayborn was treated immediately after the accident by the crew medic, who rinsed his eyes with saline and then transported him to the University of Texas Hospital Galveston Branch for additional treatment. Dr. Dawn Buckingham attended to Rayborn's eye injuries. She flushed his eyes with saline for two hours, applied an eye patch and prescribed pain medication. Rayborn returned to the rig for the final day of his hitch but rested the entire time. He was scheduled to report back to Dr. Buckingham the next day for a follow-up treatment, but instead Rayborn drove home to Mississippi. Rayborn did not follow up with a doctor during the entire two-week period that he was ashore after the accident. Rayborn continued to work his normal schedule offshore and was promoted to the position of derrick man when he returned after this incident. He continued to work fourteen-day hitches offshore until January of 1999.
Since the accident, Rayborn has seen numerous doctors regarding his right eye; however, none detected any damage to the eye that would explain Rayborn's complaints of pain, sensitivity to light, blurriness, or partial vision loss. In September 2000, Rayborn was referred to Dr. David Mielke, a psychiatrist. Dr. Mielke diagnosed Rayborn with conversion disorder, a psychological disorder where a patient believes and experiences the effects of damage to a specific body part even though there is no physical evidence of the injury. Dr. John Thompson, another psychiatrist that evaluated Rayborn's condition in January 2001, attributed Rayborn's complaints to malingering or exaggeration.
Defendants admitted liability for the injuries Rayborn sustained due to the ruptured hose, and offered judgment to the plaintiff prior to trial. The nature and extent of Rayborn's eye injuries and the amount of his damages were the only issues at trial.
A three-day jury trial was held. The jury returned a verdict in favor of Rayborn, awarding him $829,000 in general damages, $46,000 in past lost wages, and $125,000 in future loss of earnings/earning capacity, for a total award of $1,000,000.
DISCUSSION
In its first assignment of error, Defendants argue that the jury committed manifest error by awarding Rayborn $829,000 in general damages.
The various doctors who evaluated the condition of Rayborn's eye provided, at trial, extensive testimony as to their findings.
Dr. Dawn Buckingham[1]
Dr. Dawn Buckingham was the first physician to attend Rayborn after the accident *1055 offshore on the morning of September 16, 1998. At the time Dr. Buckingham was a resident in ophthalmology at the University of Texas Hospital at Galveston. Dr. Buckingham noted that Rayborn had an elevated pH level of 8.0-8.4 in his eye, and realizing that further damage could occur, she flushed his eyes out for two hours with saline, after which his eye pH was found normal; she applied medication and an eye patch. She found his visual acuity at 20/80 that pin holed to 20/60, normal pressure, normal papillary reaction, and two areas of patching with a slight amount of corneal edema in the right eye and diffuse swelling in the left eye cornea, but the remainder of Rayborn's exam was normal. Dr. Buckingham testified to the following:
Q. In simple English, what was wrong with his eye when you saw it?
A. It was a little red, and he had a slight corneal abrasion and a little bit of swelling of his right cornea.
She further testified that she felt that it was superficial damage, and found that the abrasion was not directly in Rayborn's line of slight. Dr. Buckingham found no injury to optic nerve or other part of the eye. She testified that she did not feel it was a serious injury. Dr. Buckingham requested that Rayborn return to the hospital after his hitch. Rayborn testified that he did return for the appointment but that he could not get in to see Dr. Buckingham, so he left and drove home to Mississippi with one eye. Dr. Buckingham never saw him again.
Rayborn complained to his safety supervisor, Herb Preteus, Jr., that his eye was bothering him in October of 1998. According to Preteus this was the only occasion that Rayborn made a formal complaint about his right eye while working for Diamond. Preteus made a report of Rayborn's complaints to David Ellingburgh in Diamond's claims department on October 19, 1998. Ellingburgh sent Rayborn to see Dr. Richard Wei at the Westbank Surgical Clinic.
Dr. Richard Wei
Dr. Richard Wei, an occupational medicine specialist, met with Rayborn on October 20, 1998. Dr. Wei in his examination found no physical abnormality in Rayborn's right eye. Dr. Wei found the extra-articular muscles intact, the pupils reactive to light, clear cilia and cornea, and no damage or swelling to fundus area. Nevertheless, Rayborn complained to Dr. Wei that he was experiencing a decreased field of vision in his right eye. Puzzled as to why Rayborn was complaining of visual field loss when his external components were normal, Dr. Wei referred Rayborn to Dr. Owen Leftwich.
Dr. Owen Leftwich
Dr. Owen Leftwich, a specialist in ophthalmology, also met with Rayborn on October 20, 1998. Rayborn complained again of irritation and poor vision. When Dr. Leftwich asked Rayborn to read the eye chart, Rayborn stated he was unable to see the large "E" on the board with his right eye. Dr. Leftwich then conducted a complete eye exam. He also found Rayborn's pupil response equal. In a split lamp examination, he found no abnormality in the cornea or the back of the eye. Dr. Leftwich testified Rayborn's depth perception test was abnormal but that it did not indicate a problem that would prevent Rayborn from seeing the big "E". Dr. Leftwich further testified:
Q. Were you able to explain, at all, from a medical scientific point of view, the complaints that the patient had of not being able to see?
*1056 A. Not on an organic basis, which means a chemical or anatomical basis.
Dr. Leftwich stated, "[H]e did have some redness to the eye. And, so, I treated him with some topical anti-inflammatory drops." Dr. Leftwich elaborated that the redness he observed in Rayborn's eye was not specific, and could have been from a variety of causes. Further, he could not relate the accident in September to the redness he observed that day.
Dr. Larry Parker[2]
Dr. Larry Parker, a neuro-ophthalmologist evaluated Rayborn on January 26, 1999. Dr. Parker found Rayborn's cornea had healed. Rayborn's subjective visual acuity was 20/200 in his right eye and 20/20 in the left eye. Upon examination Dr. Parker found Rayborn's pupils normal and reactive, his eyes were tracking together, and found no optic nerve problems. Dr. Parker observed that Rayborn had tunneling of the visual field, indicating a functional or non-organic problem. He performed a Goldman Field test and found Rayborn showed a "bizarrely constricted field" not similar to physical problem. Dr. Parker also found that Rayborn's degree of visual field loss varied with different tests, which to him suggests a functional disorder, not related to any actual damage of the eye.
Dr. Andrew Lawton[3]
Dr. Andrew Lawton attended Rayborn on March 8, 1999. Dr. Lawton is an ophthalmologist and a specialist in neuro-ophthalmology. He found using a four-diopter vertical prism that Rayborn had visual acuity of 20/20 in his right eye. Dr. Lawton stated, "I found that when he had both eyes open and he wasn't aware of it, but was using both eyes independently, he could read 20/20 with his right eye." Dr. Lawton found Rayborn's pupils reacted normally and equally.
Dr. Howard Katz[4]
Dr. Howard Katz, a specialist in physical medicine and rehabilitation, saw Rayborn on May 9, 1999, for his first visit. Rayborn complained to Dr. Katz of constant headaches that were continuous for seven months, right eye matting during sleep, seeing purple spots with a yellow ring surrounding it, shadow movement, photophobia, and a lack of vision in his right eye.
Dr. Katz found Rayborn's right eye did not blink on confrontation, but found "pupils equally reactive to light and accommodation." He also performed an MRI that was normal. Dr. Katz then gave Rayborn an injection of Imitrex for his headaches. On September 21, 1999, Rayborn had a second visit with Dr. Katz. He was still complaining of headaches but said they were better. Dr. Katz assessed Rayborn "did have right eye problems, that it appeared to be functional in nature, that he has post traumatic headaches and chronic daily headaches."
Dr. David Mielke
Dr. Mielke, a psychiatrist, had three sessions with Rayborn, each lasting an hour, in September, October, and December of 2000. Dr. Mielke ordered various psychological tests, including a MMPI, to be performed on Rayborn. The psychologist administering the tests, Dr. Griffen, found Rayborn suffered from a conversion or adjustment disorder. Dr. Mielke took these results and concluded Rayborn was not malingering. He asserted the psychological stressor that caused a conversion *1057 reaction in Rayborn was getting sprayed in the face, pain, not being able to see, the boat ride to the hospital in Galveston, and hearing his colleagues talking about his possible third degree burns while he was incapacitated. Dr. Mielke said for most people conversion reaction is short lived, and after two years it is considered severe, and may never go away.
Dr. John Thompson
Dr. John Thompson, a psychiatrist who specializes in forensic psychology and addiction psychology evaluated Rayborn in January of 2001. He described somatic disorders where the "patient manifests physical signs and symptoms, but the medical evidence for those physical sign and symptoms and limited or absent." Malingering, Dr. Thompson describes, as when a patient in essence makes symptoms up. Dr. Thompson's opinion was that Rayborn's situation was "more consistent with exaggerating the symptoms, or making the symptoms up, than it would be with an actual conversion disorder, where he really didn't understand why he was having these symptoms or what was the driving force behind them."
The standard of review for damage awards requires a showing that the trier of fact abused the great discretion accorded in awarding damages. Sommer v. State of Louisiana, Dep't of Transp. and Dev., 97-1929, p. 17 (La.App. 4 Cir. 3/29/00) 758 So.2d 923, 934-935. In effect the award must be so high or so low in proportion to the injury that it "shocks the conscience." Id. (citing Moore v. Healthcare Elmwood, Inc. 582 So.2d 871 (La.App. 5th Cir.1991)). Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). Moreover, when findings are based on determinations regarding the credibility of witnesses, the manifest error standard requires that great deference be afforded to the trier of fact's findings. Id.
The jury was presented with evidence from various doctors about the condition of Rayborn's eye, two psychiatrists who differed in their opinions as to whether Rayborn's complaints about his eye had a psychological basis, and Rayborn himself. The jury, hearing the testimony of Dr. Mielke and Dr. Thompson reasonably made the credibility determination that Dr. Mielke's opinion was more accurate with regard to Rayborn. We cannot, therefore, find that the jury committed manifest error in finding that Rayborn suffered an injury.
We find the general damages award is so high in proportion to the injury that it shocks the conscience. There is no evidence that Rayborn suffered permanent injury to his eye, even crediting the jury's apparent determination that he suffers from conversion disorder, to justify an award of $829,000 in general damages.
After deciding that the trial court abused its discretion, this Court is constrained to lowering the award to the highest point reasonable, within the discretion of the trier of fact. See Clement v. Griffin, 91-1664, p. 42 (La.App. 4 Cir. 3/3/94), 634 So.2d 412, 442. General damages do not have a common denominator, but are decided on a case-by-case basis. Coscino v. Wolfley, 96-0702 (La.App. 4 Cir. 6/4/97), 696 So.2d 257. Therefore, for the purposes of this case only, we must construe the highest award reasonable. Considering the facts and circumstances particular to Rayborn, we conclude that an award of $50,000 in general damages is the highest amount the jury could have reasonably awarded Rayborn for the conversion disorder. We further conclude that $250,000 in general damages is the highest amount the jury could have reasonably awarded Rayborn for the initial injury to *1058 his eyes, taking into account the extreme stress he experienced as a result of being hit in the eye with high pressure hydraulic fluid and the fear associated with the possibility of permanent blindness. Therefore Rayborn is entitled to a total general damages award of $300,000.
In its second and third assignments of error, Defendants argue that the jury committed manifest error by awarding Rayborn $125,000 in future loss of earnings/earning capacity and $46,000 in past lost wages.
Lost earnings need not be proven in every case with mathematical certainty; however, the law requires such proof as reasonably establishes the claim. Ploger v. Reese, 2001-2243, p. 9 (La.App. 4 Cir. 5/22/02), 819 So.2d 1114, 1120. This may consist of the plaintiff's own testimony. Id. This Court consistently applies the manifest error standard to judge the fact finder's conclusions respecting lost wages. Id. at p. 12, 819 So.2d at 1121.
Nathaniel Fentress[5], a vocational rehabilitation counselor, testified that after reviewing Rayborn's various medical records in his opinion Rayborn should not continue to work offshore. He further testified that given Rayborn's educational level, combined with his condition, he would be extremely limited in his employment options. Nathaniel Fentress was the only vocational rehabilitation counselor to testify at trial.
Dr. George Randolph Rice, a professor of economics at LSU, made an calculation of Rayborn's projected past and future lost earnings and benefits based on Rayborn's pre-accident wages of approximately $37,000 per year, and Rayborn's testimony that he could only get employment paying $8 per hour, assuming that Rayborn could not return to work offshore. He estimated Rayborn lost $35,453 in past earnings and would sustain $250,063 in future lost earnings.
Our review of the record reveals no evidence to support the jury's award of $46,000 to Rayborn for past-lost wages. We find that the jury committed manifest error in its determination. Our review of the record reveals the evidence supports Dr. George Rice's estimation that Rayborn lost $35,453. Therefore we reduce the jury's award of $46,000 for past-lost wages to $35,453.
Given the medical evidence presented at trial, and the uncontroverted testimony of Nathaniel Fentress and Dr. Rice, we find the jury's conclusions on Rayborn's future lost earnings/earning capacity were reasonable. The jury could have reasonably found that the injury to Rayborn's eye and subsequent conversion disorder would prevent him from working offshore again, and as such he would never be able to earn again what he did while working offshore. We find, therefore, the jury did not commit manifest error in awarding Rayborn $125,000 in future lost earnings/earning capacity.
CONCLUSION
We find that the jury was unreasonable in its award of general damages. We award Rayborn $300,000 in general damages, and affirm the jury's award of $125,000 for future loss of earnings/earning capacity and reduce the jury award for past lost wages to $35,453, for a total award of $460,453.
AFFIRMED AS AMENDED.
NOTES
[1] A portion of Dr. Dawn Buckingham's deposition was read into the record in lieu of testimony.
[2] Dr. Larry Parker's deposition was read into the record in lieu of testimony.
[3] Dr. Andrew Lawton's deposition was read into the record in lieu of testimony.
[4] Dr. Howard Katz's deposition was read into the record in lieu of testimony.
[5] Nathaniel Fentress's video deposition was presented at trial.