**CORRECTED COPY**

| | | |
|---|---|---|
| JODY ALAN GOLDSTEIN | * | NO. 2020-CA-0401 |
| VERSUS | * | |
| | | COURT OF APPEAL |
| CHATEAU ORLEANS, INC., | * | |
| LEISURE MANAGEMENT, | | FOURTH CIRCUIT |
| LTD., AND XYZ INSURANCE | * | |
| COMPANY | | STATE OF LOUISIANA |

* * * * * * *

APPEAL FROM
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2006-01073, DIVISION "N-8"
Honorable Ethel Simms Julien, Judge
* * * * * *
**Judge Regina Bartholomew-Woods**
* * * * * *
(Court composed of Judge Terri F. Love, Judge Daniel L. Dysart, Judge Regina Bartholomew-Woods, Judge Paula A. Brown, Judge Tiffany Gautier Chase)

**DYSART, J., DISSENTS WITH REASONS
CHASE, J., CONCURS IN PART AND DISSENTS IN PART WITH REASONS**

Joseph M. Bruno
BRUNO & BRUNO LLP
855 Baronne Street
New Orleans, LA 70113

Daniel A. Meyer
BRUNO & BRUNO, LLP
855 Baronne Street
New Orleans, LA 70113

     COUNSEL FOR PLAINTIFF/APPELLANT

Jay Russell Sever
Alexis Polk Joachim
PHELPS DUNBAR LLP
365 Canal Street
Canal Place - Suite 2000
New Orleans, LA 70130-6534

John C. Wegmann
Corey D. Moll
Glen B. Adams
PORTEOUS HAINKEL & JOHNSON, L.L.P.
704 Caroldelet Street
New Orleans, LA 70130


John William Hite, III
SALLEY HITE & MERCER, LLC
365 Canal Street
Suite 1710, One Canal Place
New Orleans, LA 70130

COUNSEL FOR DEFENDANT/APPELLEE

**REVERSED AND REMANDED**
**NOVEMBER 12, 2021**

*RBW*

*TFL*

*PAB*

This case concerns whether a business can be held liable for the personal injuries sustained by a customer at the hands of an independent third party and the degree to which the business may be held responsible. We further examine the trial court's discretion in granting a judgment notwithstanding the verdict.

For the following reasons, we reverse the trial court's judgment and remand for a verdict consistent with this opinion.

## FACTUAL AND PROCEDURAL HISTORY

Defendant-Appellee, Leisure Management, Ltd. ("Appellee"), maintains and operates the Chateau Orleans ("the Chateau"), a combination hotel, timeshare, and condominium facility located in the New Orleans French Quarter. The family of Plaintiff-Appellant, Jody Goldstein ("Appellant"), owns a one-week timeshare interest in Unit 13 of the Chateau.

On February 4, 2005, the Friday before Mardi Gras,[1] Appellant arrived at the Chateau and immediately observed a nearly four (4) foot long crack in the center of the door to his unit. The door was secured by a doorknob lock, an eye-loop hook, and a chain. Appellant immediately reported the cracked door to the manager on duty and was allegedly told the door would be replaced. Appellant inquired about the door multiple times, but the door was never repaired or replaced.

In the early morning of February 9, 2005, Appellant was asleep in his unit when he was awakened to the loud sound of the unit's door being broken into. Appellant investigated the sound and was confronted by three (3) assailants who proceeded to beat and rob him resulting in serious, permanent injuries. Specifically, the cartilage in his nose collapsed, leading to a chronic nasal obstruction and inflammation. He now has a septum deformity, which causes congestion, frequent nosebleeds, and headaches. He has developed sleep apnea, snoring, postnasal drip, recurrent sinus infections, loss of the ability to smell, and vertigo. Additionally, Appellant sustained dental injuries, including dislodged teeth, and root fractures. Finally, Appellant suffered injuries to his eyes resulting in blurred vision, headaches, and floaters in his field of vision.

Because it was Mardi Gras week, the Chateau had no employees on site from 5:00 p.m. on Lundi Gras until Ash Wednesday morning, a period of approximately forty (40) continuous hours. The assailants were never identified.

---

[1] In 2005, Mardi Gras occurred on February 8, 2005.

On February 7, 2006, Appellant filed a "Petition for Damages" against Chateau Orleans, Inc., Appellee Leisure Management, Ltd., and XYZ Insurance Company[2] (Collectively referred to as "Defendants").

On April 23-25, 2019, a jury trial was held. Defendants filed a motion for directed verdict. The motion was granted in favor of Defendant Chateau Orleans and the claims against Chateau Orleans were dismissed. The motion was denied regarding Appellant. At the conclusion of the trial, the jury found in favor of Appellant. The jury apportioned Appellee one hundred percent (100%) fault for Appellant's injuries and ordered Appellee to pay damages to Appellant as follows: $500,000.00 for pain and suffering; $800,000.00 for mental anguish; $200,000.00 for scarring and disfigurement; and $75,000.00 for past medical expenses. No fault was apportioned to the unnamed assailants.

On May 16, 2019, in response to the jury's verdict, Appellee filed a motion for judgment notwithstanding the verdict ("JNOV") and/or remittitur or motion for new trial.

Prior to the trial court's ruling on the motion for JNOV, Mr. Goldstein and Scottsdale Insurance Company entered into a partial settlement pursuant to *Gasquet v. Commercial Union Insurance Co*., 391 So.2d 466 (La. App. 4th Cir. 1980)[3], and Scottsdale was dismissed from the lawsuit on January 21, 2020.

---

[2] Later identified as Scottsdale Insurance Company.

[3] Pursuant to *Gasquet*, an agreement may be reached between the plaintiff in a case and the primary insurer wherein the plaintiff settles with and releases an insured defendant and its primary insurer, but reserves his or her right to pursue additional amounts available through the insured's excess insurance policy. *RSUI Indem. Co. v. Am. States Ins. Co.*, 127 F. Supp. 3d 649, 657 (E.D. La. 2015).

On September 20, 2019, a hearing was held regarding the JNOV. Following oral arguments, the trial court took the matter under advisement.

On June 10, 2020, the trial court issued its ruling granting the JNOV in favor of Appellee and dismissed Appellee from the case.

On June 11, 2020, Appellant filed a "Notice of Devolutive Appeal of Judgment Granting Motion for Judgment Notwithstanding the Verdict" and the trial court set a return date "as provided by law."[4]

This appeal timely followed.

## DISCUSSION

*Assignments of Error*

Appellant asserts the following assignments of error:

1. The trial court erred by basing its JNOV, reversing the jury verdict, on a faulty application of the *Posecai* balancing test, where it failed to consider any evidence beyond the prior incidents of similar crime at the Chateau Orleans.

2. The trial court erred by limiting the "area" of prior crimes in its foreseeability analysis to the physical premises of the Chateau Orleans, resulting in the failure to consider hundreds of relevant prior crimes.

3. The trial court erred by failing to consider prior incidents of crimes of opportunity or economic gain in and around the Chateau Orleans as part of its foreseeability analysis.

4. The trial court erred by concluding there was no basis to impose a duty on Appellee to provide adequate security to the plaintiff despite Appellee's admission that the Chateau Orleans is in a dangerous area at night.

5. The trial court erred by failing to consider the heightened duty owed by Appellee to Appellant as an Innkeeper in its determination that Appellee owed no duty to provide adequate security to Goldstein.

---

[4] Because this occurred during the COVID-19 pandemic, the trial court was likely hesitant to set a specific date in consideration of various court closures pursuant to Executive Orders of the Governor and the Louisiana Supreme Court.

6.  The trial court erred by failing to consider Appellee's negligence regarding the defective door to Unit 13 as [a] relevant factor to its inadequate security, and an independent basis for liability under La. C.C. art. 2317.1.

*Analysis*

<u>*Standard of Review*</u>

Louisiana Code of Civil Procedure article 1811(F) is the authority for a JNOV and provides that a motion for judgment notwithstanding the verdict may be granted on either the issue of liability or on the issue of damages or on both. *Davis v. Wal-Mart Stores, Inc.*, 2000-0445, p. 4 (La. 11/28/00), 774 So. 2d 84, 89.

The standard of review for a JNOV on appeal is a two-part inquiry. *Id.*, 2000-0445, p. 5, 774 So. 2d at 89. First, the appellate court must determine if the trial court erred in granting the JNOV. *Id.*

> The standard to be used in determining whether a JNOV has been properly granted has been set forth in our jurisprudence as follows:
>
> 'A JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable jurors could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. If there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied. In making this determination, the court should not evaluate the credibility of the witnesses and all reasonable inferences

5

or factual questions should be resolved in favor of the non-moving party.'

*Id*. (internal citations omitted). "In ruling on a motion for JNOV, a court may not weigh the evidence or substitute its judgment for that of the jury." *Young v. United States Auto. Ass'n Cas. Co.*, 2007-1590, p. 5 (La. App. 4 Cir. 6/10/09), 15 So. 3d 327, 331; *In re New Orleans Train Car Leakage Fire Litigation*, 2000–1919, p. 6 (La .App. 4 Cir. 4/20/05), 903 So.2d 9, 15; *Coleman v. Deno*, 99–2998, p. 22 (La. App. 4 Cir. 4/25/01), 787 So.2d 446, 465. If a reasonable jury exercising impartial judgment might reach a different conclusion, then granting the JNOV was an error and the jury verdict should be reinstated. *Davis v. Lazarus*, 2004-0582, p. 8 (La. App. 4 Cir. 3/8/06), 927 So. 2d 456, 461 (quoting *Anderson v. New Orleans Public Service, Inc.*, 583 So.2d 829, 832 (La.1991)).

Second, if the appellate court determines that the trial court correctly applied its standard of review as to the jury verdict, the appellate court reviews the JNOV using the manifest error standard of review. *Davis*, 2000-0445, p. 5, 774 So. 2d at 89. In applying the manifest error standard of review, the appellate court must not determine whether the trier of fact was right or wrong, but only whether the factfinder's conclusion was a reasonable one. *Chaisson v. Louisiana Rock Monsters, LLC*, 2013-1423, p. 3 (La. App. 4 Cir. 4/2/14), 140 So. 3d 55, 57 (citing *Poissenot v. St. Bernard Parish Sheriff's Office*, 09–2793, p. 6 (La.1/9/11), 56 So.3d 170, 174). When reviewing facts, if there are two permissible views of the evidence, a factfinder's choice between them can never be manifestly erroneous or clearly wrong. *Id.* (citations omitted). "'[I]f the [factfinder's] findings are

reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.'" *Id*. (quoting *Banks v. Industrial Roofing & Sheet Metal Works*, *Inc.*, 96–2840, p. 8 (La.7/1/97), 696 So.2d 551, 556).

In light of the aforementioned, the manifest error standard of review applies to the instant appeal.

*Whether the trial court erred in granting the JNOV*

In the current case, the trial court granted the JNOV focusing on whether Appellee owed a duty of protection to Mr. Goldstein by virtue of the foreseeability of the crime.[5] Relying heavily on *Posecai v. Wal-Mart Stores, Inc.*, 99-1222 (La. 11/30/99), 752 So. 2d 762, the trial court determined Appellee owed no duty to Appellant because the crime was not foreseeable and dismissed the suit with prejudice.

This Court finds the trial court erred by improperly narrowing the rule established in *Posecai* and limiting the foreseeability analysis to similar crimes, which had taken place on the property. Furthermore, the trial court erred in determining Appellee owed no duty of protection to Appellant.

*Innkeeper Standard*

---

[5] In its reasons for judgment, the trial court wrote, "The threshold issue is whether defendant, Leisure Management[,] Ltd.[,] [o]wed plaintiff, Mr. Goldstein [,] a duty to protect him from the criminal acts of third parties." This Court notes the "reasons for judgment only set forth the basis for the court's holding and are not binding…. Nevertheless, an appellate court may use a trial court's written reasons for judgment "to gain insight into the district court's judgment." *Bernstein v. Bernstein*, 2019-1106, p. 13 (La. App. 4 Cir. 2/10/21), 313 So. 3d 413, 423, *writ denied*, 2021-00390 (La. 5/4/21), 315 So. 3d 220, and *writ denied*, 2021-00380 (La. 5/4/21), 315 So. 3d 222.

7

Before addressing foreseeability, it is important to determine the degree of duty the Appellee owed to protect its guests from third–party harm. Generally, businesses have no duty to protect patrons from the criminal acts of third parties; "[h]owever, in Louisiana, an 'innkeeper has a duty to take reasonable precautions against criminals.'" *Dearmon v. St. Ann Lodging, L.L.C.*, 2018-0994, p. 4 (La. App. 4 Cir. 3/27/19), 267 So. 3d 639, 642 (quoting *Salafian v. Gabriel*, 2013-1399, p. 6 (La. App. 4 Cir. 7/16/14), 146 So.3d 753, 757). A hotel owes a duty to its patrons to exercise reasonable and ordinary care including maintaining the premises in a reasonably safe and suitable condition. *Fleming v. Hilton Hotels Corp.*, 1999-1996, p. 4 (La. App. 4 Cir. 7/12/00), 774 So. 2d 174, 177. Per the pleadings and transcripts, Appellee made a herculean effort to dismiss the innkeeper standard as being applicable in the current case, but the determination of whether the Chateau is a general business or an inn subject to a higher degree of duty is an important step in the duty analysis.

The Chateau serves as a multi-purpose property containing timeshares and condominiums. Though marketed as a timeshare, condominium, and hotel property, Appellee avers the property does not operate as a hotel, but simply rents out available space when the timeshare and condominium owners are not in residence.[6] Appellee was tasked with maintaining the entire property whether it be

---

[6] The Appellant testified at trial that he would visit the city outside of the purchased timeshare week and would make a "reservation" with the Chateau and stay in another unit on the property. Appellant described the process as "book[ing] a room like I would book any hotel."

a timeshare unit or a condo, and had sole control over security, repairs, and improvements.

A timeshare owner had no more ability to repair the door or demand staff remain on premises than the hotel guests. Timeshare owners could not change the locks or doors, or set up security cameras and alarms for their safety. Such actions were in the sole discretion of Appellee.

This Court wishes to avoid creating a slippery slope, which would allow the application of the innkeeper standard to any business that provides some type of room and board, but in the instant case, we find that the innkeeper standard does, in fact, apply. Appellee wants this Court to view the "renting" of the unoccupied units as a type of sublet situation rather than what it is: a hotel filling vacancies. There is no assertion that when the unoccupied units are rented out that a sublease contract is signed or any other indication that a landlord/tenant situation is created. There is also no evidence in the record before us that a potential patron who books a room and is placed in an unsold unit would need to enter into either a timeshare or condominium agreement. If that patron is neither an owner, nor a renter, what status would he hold if not as a hotel guest? Thus, based on the record before us,

we find that The Chateau operates as a hotel[7], as well as, a timeshare[8] and condominium property[9].

The diversity of unit types combined with the Appellee's total control of the property's management makes it unreasonable to find that Appellee had a duty to protect one unit, but the unit right next door is not owed any protection simply because the occupant is a timeshare owner. There was no greater burden placed on Appellee to protect the timeshare units along with the hotel units, especially considering the only security measures in place were locked doors, gates, and live-feed cameras. Furthermore, because the timeshare units doubled as hotel rooms, it would be an illogical legal conclusion to state that a duty is owed to a particular unit one week, but not another based upon the class of the patron occupying the room. The innkeeper standard and the higher duty of protection against third parties applies. Even had this Court not chosen to apply the innkeeper standard, Appellee would still owe Appellant a duty of protection from third parties based on the following foreseeability analysis.

*Foreseeability*

---

[7] A hotel is "an establishment that provides lodging and usually meals, entertainment, and various personal services for the public." *Hotel Definition*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/hotel (last visited Nov. 4. 2021).

[8] A timeshare is defined as, "joint ownership or rental of a vacation lodging [ ] by several persons with each occupying the premises in turn for short periods." *Timeshare Definition*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/time-share (last visited Nov. 4. 2021).

[9] A condominium is defined as a multiunit structure comprised of "individual ownership of a unit in [the] multiunit structure (such as an apartment building) or on land owned in common." *Condominium Definition*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/condominiums (last visited Nov. 4. 2021).

The Louisiana Supreme Court adopted the rule that, generally, businesses have no duty to protect patrons from the criminal activities of third persons; however; the duty to protect does arise when the criminal act in question was reasonably foreseeable to the owner of the business. "Determining when a crime is foreseeable is therefore a critical inquiry." *Posecai*, 99-1222, p. 6, 752 So. 2d at 766. The greater the foreseeability and gravity of the harm, the greater the duty of care imposed on the business. *Id*. 99-1222, p. 8, 752 So. 2d at 768. A very high degree of foreseeability is required to give rise to a duty to post security guards, but a lower degree of foreseeability may support a duty to implement lesser security measures such as surveillance cameras, fencing, and improved lighting. *Id*. Foreseeability is determined, first and foremost, by "the existence, frequency and similarity of prior incidents of crime on the premises." *Posecai*, 99-1222, p. 9, 752 So. 2d at 768. However, and more pertinent to the present case, the analysis does not end with incidents on the premises; the court should also consider "the location, nature and condition of the property." *Id*.; *Dearmon*, 2018-0994, p. 4, 267 So. 3d 639, 642. Thus, the nature of the surrounding area is a factor in determining foreseeability, even when no violent crimes have occurred on the subject property itself. *Strauss v. Ironshore Specialty Ins. Co.*, 2020-0411, p. 4-5, 2020 (La. App. 1 Cir. 12/30/20) WL 7770879 (reasoning the high crime surrounding the apartment, the safety measures enacted by the apartment, and the tenants expressed concerns raised a genuine issue of whether foreseeability existed despite the lack of violent crime on the apartment premises).

We find that the trial court improperly limited its analysis to only the first consideration – crimes on the premises.[10] "*Posecai* in no way implies, nor should it be interpreted to imply, that a business' duty to protect customers from the criminal attacks of third persons does not arise until a customer is actually assaulted on the premises." *Pinsonneault v. Merchants & Farmers Bank & Tr. Co.*, 2001-2217, p. 9 (La. 4/3/02), 816 So. 2d 270, 277. The trial court's finding that there have been few - or zero - crimes, committed on the property is only the beginning of the analysis and "other factors, such as the location, nature, and condition of the property should also be taken into account." *Id.*

In *Pinsonneault*, Jesse Pinsonneault was fatally shot while making a night deposit at a bank, and his parents filed a wrongful death suit alleging the bank failed to provide after-hours security. 2001-2217, p. 1, 816 So. 2d at 272. The trial court ruled the bank did not breach the duty owed to Mr. Pinsonneault because the bank was last robbed four (4) years prior to Mr. Pinsonneault's encounter, the robbery did not involve harm to customers, and the night depository posed a very low crime risk. *Id.* 2001-2217, p. 9, 816 So. 2d at 277. The Louisiana Supreme Court reversed the trial court, reasoning that even though there had been no previous robberies on the property, the crime was foreseeable because the bank took action on routine security reviews, which suggested it should install lighting,

---

[10] In its reasons for judgment the trial court stated "the only crimes that can be considered in determining foreseeability are those that occurred within the Chateau Orleans and those that are similar to the assault, battery, and robbery of plaintiff, Mr. Goldstein."

fencing, and cameras in response to the increase in crime in the surrounding neighborhood. *Id*. 2001-2217, p. 10-11, 816 So. 2d at 278.

In *Dearmon*, the appellants were beaten and robbed in their hotel room and subsequently filed suit alleging the hotel was negligent for failing to provide adequate security. 2018-0994, p. 2, 267 So. 3d at 641. The appellee-hotel filed a motion for summary judgment arguing there was no duty to protect because the crime was not foreseeable. *Id*. The hotel showed there had been no previous violent incidents or known criminal activity at the hotel or in the area immediately surrounding the hotel. *Id*. 2018-0994, p. 5, 267 So. 3d at 642. The trial court granted the motion. *Id*. 2018-0994, p. 2, 267 So. 3d at 641. On appeal, this Court reversed the granting of summary judgment and remanded the case. *Id*., 2018-0994, p. 6, 267 So. 3d at 643. This Court found the crime was foreseeable based on the circumstances immediately preceding the attack. *Id*. Specifically, this Court reasoned that the report submitted by the appellants' security expert detailing the staff's monitoring of the suspicious people on the premises but failing to intervene, and the hotel's central location in the French Quarter were sufficient to create a genuine issue of material fact as to whether the crime was foreseeable. *Id*., 2018-0994, p. 5, 267 So. 3d at 643.

This Court again found a crime to be foreseeable, despite a lack of previous attacks on the premises in *Chatman v. S. Univ. at New Orleans*, 2015-1179 (La. App. 4 Cir. 7/6/16), 197 So. 3d 366. Gloria Chatman, a student at Southern University of New Orleans ("SUNO") was attacked in her campus dormitory room

by her dormitory-mate and the dormitory-mate's family member, a minor who was living in the dormitory but, was neither a student, nor a resident at SUNO. *Id*. 2015-1179, p. 1, 197 So. 3d at 369 - 70. Prior to the attack, Ms. Chatman repeatedly attempted to express security concerns about the various non-students coming in and out of her residence hall, in violation of the university's residence hall policies against non-resident overnight guests. *Id*. 2015-1179, p. 20, 197 So. 3d at 380. She was unsuccessful because SUNO failed to provide her with the contact information of the community assistant.[11] *Id*. Additionally, against university policy regarding on-site security, no patrols passed Ms. Chatman's dormitory because the SUNO officer only conducted vehicular patrols of the parking lots and there were no parking lots close to Ms. Chatman's building. *Id*. Ms. Chatman filed suit against the university alleging the university failed to protect her. *Id*. 2015-1179, p. 2, 197 So. 3d at 370. Following a jury trial, SUNO was judged to be fifteen percent (15%) at fault for the personal injuries sustained by Ms. Chatman. *Id*. 2015-1179, p. 1, 197 So. 3d at 369. SUNO appealed asserting the attack was unforeseeable.[12] *Id*. 2015-1179, p. 10, 197 So. 3d at 374.

This Court reasoned that SUNO failed to ensure staff was available to help with security problems and failed to enforce its own written policies. *Id.* 2015-

_____

[11] Community Assistants were student employees responsible for "enforc[ing] policies to help ensure the safety and well-being of the students" and were tasked by the university with checking the residence halls twice weekly to ensure there were no policy violations in place like unauthorized visitors. *Chatman*, 2015-1179, p. 3 So. 3d at 370.
[12] On appeal, SUNO asserted three assignments of error: (1) the trial court erred in casting SUNO in judgment because SUNO owed no legal duty to protect Ms. Chatman from such an unforeseeable criminal attack; (2) the trial court erred in failing to rule on the issue of legal cause, or alternatively, to properly instruct the jury on the issue of legal cause; and (3) the trial court erred in assessing costs against SUNO. *Chatman*, 2015-1179, p. 10, 197 So. 3d at 374.

1179, p. 21, 197 So. 3d at 380. This failure to perform their job as required per the university's policy, and the lack of security presence made it foreseeable that the crime would occur. *Id*. This Court ultimately found that the university's policies in not allowing unauthorized visitors and security procedures were in place to prevent the exact type of harm that occurred—a dormitory room attack on a student by a nonstudent; therefore, even though no similar crime had previously happened on the campus, the crime was foreseeable. *Id*. 2015-1179, p. 22, 197 So. 3d at 381.

The above-cited cases have one particular thing in common: no similar crime had previously occurred on the premises. The courts conducted the foreseeability analysis by considering the circumstances preceding and surrounding the crimes including: control over the properties, existing security policies, and the victim's actions to protect themselves. In each case, the businesses' actions—or lack thereof—in response to their own security measures convinced the courts that the crimes were foreseeable. The trial court in the instant case did not follow this established jurisprudence. Even though no similar violent crime previously occurred on the premises, the trial court should have considered the totality of the circumstances surrounding the attack on Appellant.

Appellee had total control over the Chateau. Appellant did not have the authority to make any changes or repairs to the room he was staying in. If there were any issues, Appellant would have to report the issues and rely on Appellee to assess and repair. Appellant did, in fact, report the cracked door, but Appellee failed to address the security issue and fix the door. The facts in this case are

analogous to *Chatman* where the victim attempted to inform SUNO (the owner of the property) of her safety concerns and was met with inaction. As reasoned in *Posecai*, even a low degree of foreseeability creates a duty to implement some measure of security. 99-1222, p. 8, 752 So. 2d at 768. Similarly, in *Kraaz v. La Quinta Motor Inns, Inc.*, 410 So. 2d 1048 (La. 1982), a hotel employee gave a pass key, which opened all of the doors in the hotel, to two men claiming to be hotel guests. *Id*. at 1050. The Court reasoned that "[s]afeguarding the room key is a minimum requirement" and affirmed the jury's finding of negligence on the part of the hotel. *Id*. at 1053. If safeguarding a key is a minimum requirement, then surely repairing and securing a broken door, is the most basic form of security a patron of a hotel could expect.[13] Appellee failed to provide the most basic security; Appellee knew of the security defect, but failed to perform their duty and repair/replace the door.

There was no staff on duty at the Chateau despite Appellee having installed live-feed cameras. Because the cameras were live-feed only, it is reasonable to assume that someone should have been on–duty monitoring the cameras to ensure patrons are able to get in and uninvited individuals stay out. Both *Pinsonneault* and *Chatman* reasoned that the enacted security measures were preventative measures, thus suggesting that even though a violent crime had not happened, the crime was foreseeable. The same reasoning applies in the instant case. The cameras, security gate, and spike-topped gates at the Chateau were in place because third parties

---

[13] Appellant's door could only be secured by a doorknob turn lock, an eye-loop latch, and a chain. There was no deadbolt or heavy-duty-type lock on the door.

entering the premises and committing a crime was a foreseeable possibility that the unmanned cameras were meant to prevent or, at a minimum deter, criminal acts. Without speculating on how the assailants got in, it is not unreasonable to assume that the staff's presence and a secure door would have been a strong deterrent.

Moving beyond the property, consideration of the surrounding area is also part of the foreseeability analysis. The crime took place in the French Quarter during Mardi Gras week. Both Louisiana federal and state courts recognize the French Quarter as a high crime area. *See Dotson v. Edmonson*, No. CV 16-15371, 2018 WL 501512, at *4 (E.D. La. Jan. 22, 2018)(Wherein the court did not dispute the defendants' assertion that the French Quarter is a high crime area); *United States v. George*, No. CR 16-29, 2017 WL 5572617, at *3 (E.D. La. Nov. 20, 2017)(Wherein the court reasoned the French Quarter during Mardi Gras weekend is "a high crime area"); *State v. Keller*, 403 So. 2d 693, 696 (La. 1981)(Wherein the Louisiana Supreme court noted "the French Quarter is a high crime area especially noted for violent crimes). Given the time of year and location in the French Quarter, the occurrence of crime is a foreseeable event.

Considering either the higher duty Appellee owed as an innkeeper or the totality of the circumstances surrounding the crime: including the broken door, lack of hotel staff and security monitoring, the crime in the surrounding area, and the time of year at which the crime occurred, there was no showing that the evidence was so overwhelmingly in Appellee's favor that a reasonable jury would have only sided with Appellee. *See Davis*, 2000-0445, p. 4, 774 So. 2d at 89.

17

Because a reasonable jury exercising impartial judgment could reach a different conclusion, we find the trial court committed manifest error in granting the JNOV. Additionally, we find the trial court manifestly erred by improperly narrowing the *Posecai* standard to similar crimes occurring on the premises. In doing so, the trial court weighed evidence and substituted its own judgment for that of the jury; thus, warranting reversal of the JNOV and reinstatement of the jury verdict. Accordingly, we find Appellant's assignments of error meritorious.

*Allocation of Fault*

In the memorandum in support of the JNOV, Appellee asserted a JNOV was warranted because - among other reasons - the jury incorrectly allocated one hundred percent (100%) fault to Appellee and no fault to the perpetrators of the crime. The trial court declined to address this line of reasoning when granting the JNOV; however, in the interest of justice, we shall consider the allocation of fault.

> At the outset, we note the absence of an assignment of error or lack of objection … by a litigant would not prevent the court of appeal from raising this issue. Without doubt, an appellate court has the authority to raise an issue *sua sponte* on appeal. The state constitution authorizes the appellate jurisdiction of a court of appeal in civil matters to extend to law and facts. La. Const. art. 5, § 10(A) and (B). La. C.C.P. art. 2129 specifically provides: '[a]n assignment of error is not necessary in any appeal.' La. C.C.P. art. 2164 provides an appellate court 'shall render any judgment which is just, legal, and proper upon the record on appeal.' Likewise, the uniform rules of the appellate courts require that an issue be submitted in an assignment of error, after first being raised in the district court, '*unless the interest of justice clearly requires otherwise*.' Uniform Rules Courts of Appeal, Rule 1–3 (emphasis added).
> This court has held, on the basis of this constitutional and codal authority, that an 'appellate court

clearly had the authority to consider [an issue] even though there was no assignment of error in that regard.' *Nicholas v. Allstate Ins. Co.*, 1999–2522 p.7–8 (La.8/31/00), 765 So.2d 1017, 1023; *see also Georgia Gulf Corp. v. Board of Ethics for Public Employees*, 96–1907 p. 5–6 (La.5/9/97), 694 So.2d 173, 176. Under the law, the court of appeal ha[s] the authority to raise an issue on appeal *sua sponte*.

*Wooley v. Lucksinger*, 2009-0571, p. 62-63 (La. 4/1/11), 61 So. 3d 507, 562–63 (emphasis in original).

La. Civ. C. art. 2323A provides:

A. In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, regardless of whether the person is a party to the action or a nonparty, and regardless of the person's insolvency, ability to pay, immunity by statute, including but not limited to the provisions of R.S. 23:1032, or that the other person's identity is not known or reasonably ascertainable.

In the current case, the jury was tasked with apportioning fault between Appellee and the unknown assailants. After deliberation, the jury apportioned all fault to Appellee leaving the assailants free of fault. This result is in contradiction to Louisiana statutory and jurisprudential authorities requiring some portion of fault be assessed against the intentional tortfeasor. La. Civ. C. art. 2324; *Turner v. Shop Rite, Inc.*, 2014-315 (La. App. 3 Cir. 10/1/14), 149 So. 3d 427.

Pursuant to La. Civ. C. art. 2324, "liability for damages caused by two or more persons shall be a joint and divisible obligation. A joint tortfeasor *shall not be liable for more than his degree of fault* and shall not be solidarily liable with any other person for damages attributable to the fault of such other person" (emphasis added). In interpreting this statute, the Louisiana Third Circuit reasoned

the party actually responsible for the harm, the intentional tortfeasor, even if unknown, must be apportioned some fault. *Turner*, 2014-315 p. 4, 149 So. 3d at 430. Turner's reasoning is supported by the Louisiana Supreme Court, which has found, "the fault of every person responsible for a plaintiff's injuries [must] be compared, whether or not they are parties." *Dumas v. State ex rel. Dep't of Culture, Recreation & Tourism*, 2002-0563, p.11 (La. 10/15/02), 828 So. 2d 530, 537. In line with our Supreme Court and the Third Circuit, we find that an intentional tortfeasor must be assigned some portion of fault. Since no fault was assigned to the assailants in the current case, the jury's allocation of fault was clearly wrong and fault should be reapportioned accordingly.[14]

When "the court of appeal finds a 'clearly wrong' apportionment of fault, it should adjust the award, but only to the extent of lowering or raising it to the highest or lowest point respectively which is reasonably within the trial court's discretion." *Clement v. Frey*, 95-1119, p. 7-8 (La. 1/16/96), 666 So. 2d 607, 611 (Wherein the Supreme Court reallocated fault in a car accident and remanded the case back to the district court to recalculate the monetary judgment based on the reallocation).

In determining fault, Louisiana courts have adopted the guideline set forth in *Watson v. State Farm Fire & Cas. Ins. Co.*, 469 So. 2d 967, 974 (La. 1985). The

---

[14] Prior to the 1996 revision of La. Civ. C. art. 2323, the Louisiana Supreme Court in *Christi Veaz Veazey v. Elmwood Plantation Assocs., Ltd.*, 93-2818 (La. 11/30/94), 650 So. 2d 712, and its progeny held that it was appropriate to apportion fault to both intentional and negligent tortfeasors and apply a balancing test. However, that jurisprudence was superseded by the 1996 revision of La. Civ. C. art. 2323. In applying the revision, the Louisiana Supreme Court in *Dumas*, 2002-0563, p. 11, 828 So. 2d at 537 clarified that all parties are apportioned fault regardless of the theory of liability.

court "shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed." *Id*. In assessing the nature of the conduct of the parties, the court may consider:

(1) Whether the conduct resulted from inadvertence or involved an awareness of the danger;

(2) How great a risk was created by the conduct;

(3) The significance of what was sought by the conduct;

(4) The capacities of the actor, whether superior or inferior; and

(5) Any extenuating circumstances which might require the actor to proceed in haste, without proper thought. *Id*.

Apportionment is not an exact science: no formula exists and varies by case. *Riley v. Reliance Ins. Co.*, 97-0445, p. 6 (La. App. 4 Cir. 11/19/97), 703 So. 2d 158, 163. We, therefore, reviewed similar cases for guidance in fault apportionment to apply the correct apportionment of fault to the instant case. "[T]he Supreme Court held that any allocation of fault falling between a ratio of 50/50 and 75/25 would be reasonable." *Riley*, 97-0445, p. 6, 703 So. 2d at 163 (citing *Clement*, 95-1119 p. 9-10, 666 So. 2d at 612).

This Court reversed a fault allocation where the trial court failed to apportion fault to the perpetrator. *Wijngaarde v. Parents of Guy*, 97-2064, p. 10 (La. App. 4 Cir. 9/2/98), 720 So. 2d 6, 12 (wherein the plaintiff sued the bus company and school board for damages after she was battered by a fellow student after both were forced off the bus by the bus driver). This Court apportioned sixty percent (60%) fault to the actual perpetrator *Id*. Fault was further assessed against the bus company and school board at twenty percent (20%) and ten percent (10%), respectively, for a combined total of thirty percent (30%) fault because of their

21

negligence in failing to take steps to prevent the battery even though they had knowledge of prior incidents between the plaintiff and the perpetrator, and knew or should have known there would likely be another altercation. *Id*. 97-2064, p. 9 - 10, 720 So. 2d at 11 - 12. The plaintiff was apportioned ten percent (10%) fault for verbally insulting the perpetrator on previous occasions rather than attempting to avoid interactions with the perpetrator. *Id*. 97-2064, p. 12, 720 So. 2d at 13.

In *Muse v. Dunbar*, the Third Circuit, considering a wrongful death and survival action, confirmed an allocation wherein the intentional perpetrator was apportioned sixty percent (60%) fault and the negligent tortfeasors were apportioned a total of forty percent (40%) fault. 97-582, p. 4 (La. App. 3 Cir. 6/10/98), 716 So. 2d 110, 113. The court reasoned that the negligent tortfeasors, after accepting responsibility for the victim, brought the victim into a known dangerous situation and acted in such a way that escalated the danger leading to the victim's death. *Id*. 97-582, p. 4, 716 So. 2d at 114-15. In *Babb v. Boney*, a melee occurred outside of a bar leading to an innocent bystander getting struck and suffering serious injury. 30,443, p. 1 (La. App. 2 Cir. 4/8/98), 710 So. 2d 1132, 1133. The Second Circuit reallocated fault to increase the fault percentage allocated to the intentional tortfeasor who struck the plaintiff to fifty-five percent (55%). *Id*. 30,443, p. 6, 710 So. 2d at 1135. The individual who initiated the interaction, was affirmed to be twenty percent (20%) at fault with other participants in the melee affirmed to be twenty-five percent (25%) at fault for their negligent involvement. *Id*. 30,443, p. 12, 710 So. 2d at 1138. This totaled a

22

seventy-five percent (75%) allocation for the intentional perpetrators; twenty-five percent (25%) for negligent actors, and zero percent (0%) for the innocent victim.

The Second Circuit again considered apportionment of fault in *Morrison v. Kappa Alpha Psi Fraternity*, 31,805 (La. App. 2 Cir. 5/7/99), 738 So. 2d 1105. A student at Louisiana Tech. was hospitalized following a hazing incident in a fellow student's dorm room. *Id*. 31,805, p. 1, 738 So. 2d at 1110. The court affirmed the trial court's allocation of zero percent (0%) fault to the victim, thirty-four percent (34%) fault to the intentional tortfeasor and thirty-three percent (33%) each to the State and the fraternity for their negligent failures to intervene and enforce their anti-hazing policies. *Id*. 31,805, p. 20, 738 So. 2d at 1120-21.

Based on the *Watson* factors and the above-cited cases, we find Appellant's fault to be zero percent (0%) because his actions did not in any way incite, cause, or contribute to his injuries. He informed Appellee of the defective door and locked the door to the best of his ability prior to the attack, then went to bed. There was nothing more he could have done to prevent any potential break-ins. We apportion Appellee's fault to be fifty percent (50%) in accordance with the aforementioned jurisprudence. Appellee's failure to secure Appellant's door and failure to monitor the live-feed cameras created the foreseeable harm of the robbery. While Appellee's behavior was not out of malice or with intent to cause harm, there was a disregard for Appellant's safety as a patron on the premises. The fact that Appellee had sole control over the upkeep of the property leaving Appellant with little recourse but to rely on Appellee for his safety created an

urgency Appellee failed to act upon. Finally, we apportion fifty percent (50%) fault to the unknown assailants who acted purposefully, maliciously, and with an intent to harm.

*Damages*

Appellee contends the damages awarded were excessive. "Consideration of the jury's determination of damages is limited to a review for abuse of discretion on appeal." *Urquhart v. Spencer*, 2017-0069, p. 14 (La. App. 4 Cir. 7/27/17), 224 So.3d 1022, 1032; *Delphen v. Dep't of Transp. & Dev.*, 94-1261, p. 12 (La. App. 4 Cir. 5/24/95), 657 So.2d 328, 335. Vast discretion is vested in the trier of fact because "'awards of general damages, at least as to the amount awarded for injuries proved to have been caused by the tort, cannot be calculated with mathematical certainty.'" *Urquhart*, 2017-0069, p. 13, 224 So.3d at 1032 (quoting *Guillory v. Insurance Co. of North America*, 1996-1084, p. 1 (La. 4/8/97), 692 So.2d 1029, 1036 (Lemmon, J., concurring)). The reviewing court must evaluate the particular injuries and their effects on the particular injured persons. *Id*. 2017-0069, p. 14, 224 So.3d at 1032. If it is determined that there was an abuse of discretion, the appellate court may review prior awards to determine the highest and lowest reasonable awards. *Id*. The trier of fact abuses it discretion when the award is "so high or so low in proportion to the injury that it 'shocks the conscience.'" *Rayborn v. Diamond Offshore Co.*, 2002-0084, p. 8 (La. App. 4 Cir. 11/13/02), 832 So. 2d 1052, 1057 (quoting *Sommer v. State of Louisiana, Dep't of*

*Transp. and Dev.,* 97–1929, p. 17 (La. App. 4 Cir. 3/29/00), 758 So. 2d 923, 934-35).

As detailed *supra*, a review of the record reveals the extent of Appellant's injuries. He sustained multiple serious injuries to his face as a result of the attack. The cartilage in his nose collapsed leading to a chronic nasal obstruction and inflammation. He has a septum deformity, which causes congestion, frequent nosebleeds, and headaches. As a result of the nose damage, he has developed sleep apnea, snoring, postnasal drip, recurrent sinus infections, loss of the ability to smell, and vertigo. Additionally, Appellant sustained dental injuries including dislodged teeth, and root fractures. Finally, Appellant suffered injuries to his eyes resulting in blurred vision, headaches, and floaters in his field of vision.

To treat these various injuries, Appellant underwent diagnostic testing, reconstructive surgeries, rhinoplasty, restorative dental surgery, and treatment for infections. He underwent therapy to help work through his trauma related to the attack. Appellant shall continue to suffer as a result of the attack as his diagnoses include new chronic conditions (chronic nasal passage obstruction and inflammation, chronic nasal congestion). Appellant takes multiple medications to treat anxiety, insomnia, inflammation, infections, and breathing difficulties. His doctors speculate future medical treatment will be required including diagnostic testing to monitor his chronic conditions, additional corrective nasal and dental surgeries, and continued physical and psychological therapy.

In the current case, the jury awarded Appellant eight hundred thousand dollars ($800,000.00) for mental anguish; five hundred thousand dollars ($500,000.00) for physical pain and suffering; two hundred thousand dollars ($200,000.00) for scarring and disfigurement; and seventy-five thousand dollars ($75,000.00) for past medical expenses.

The jury's award of $800,000 for mental anguish is so far out of line with past awards that it "shocks the conscience." No justification was given for such a large award. A quantum review identifies a reasonable award for mental anguish resulting from assault and/or battery should be within the range from $10,000[15] to $40,000.[16] An award of $800,000 is excessive and therefore an abuse of discretion. An adjustment of this award so that it is in line with the quantum is well within this Court's discretion. However, given the level of violence that Appellant experienced and his continuing need for therapy, the maximum amount identified within the quantum range is justified. Therefore, we hereby adjust the damages awarded by the jury for mental anguish from $800,000 to $40,000.

We next examine the award of $500,000.00 for physical pain and suffering and $200,000.00 for scarring and disfigurement. Because physical pain and suffering and the resulting scarring and disfigurement are traditionally combined as one award, this Court shall combine these awards in our analysis. The jury's award of $500,000 for physical pain and suffering and $200,000 for scaring and

---

[15] *Cazenave v. Pierce*, 568 So. 2d 1360, 1367 (La. App. 4th Cir. 1990) (assault and battery in an elevator).
[16] *Fisher v. Louisiana Dep't of Pub. Safety*, 555 So. 2d 626, 629 (La. App. 4th Cir. 1989) (assault and battery by a police officer).

disfigurement combine for an award of $700,000. Our quantum review reveals the following ranges based on Appellant's reported injuries:

- For oral injuries: minimum $10,000;[17] maximum $116, 557;[18] and

- For facial injuries: minimum $45,000;[19] maximum $220,000.[20]

By combining the quanta for physical injuries, we calculate a minimum award of $55,000 and a maximum award of $336,557. The combined award of $700,000 is excessive and therefore an abuse of discretion. We hereby adjust the award to $500,000.

Although the award of $500,000 is beyond the quantum maximum we believe this is justified, the appellate court is not bound by the outer limits of a quantum but rather use it as a guide in determining whether the trier of fact abused its discretion in the damages awarded. *See Urquhart*, 2017-0069, p. 15, 224 So. 3d at 1033. The cases reviewed for the quantum have different fact patterns from the current case because the injuries were frequently the result of car accidents, as opposed to harm purposefully inflicted during the commission of a crime. While the quantum is informative in our analysis, we must consider the unique fact pattern of the case before us. In consideration of the purposeful and violent nature of the injuries Appellant sustained, as well as the extent of his permanent injuries and the need for future and ongoing medical care as contained within the record

---

[17] *Morse v. New Orleans Steamboat Co.*, 580 So. 2d 544 (La. App. 4th Cir. 1991) (tooth loss and root canal).

[18] *Wijngaarde v. Parents of Guy*, 97-2064, p. 14, 720 So. 2d at 6 (fractured jaw and surgery).

[19] *Jackson v. Palmer*, 98-1856 (La. App. 4 Cir. 1/13/99); 727 So. 2d 636 (orbital fractures, septal deviation, sinus infections, headaches).

[20] *Delphin v. DOTD*, 94-1261 (La. App. 4 Cir. 5/24/95); 657 So. 2d 328 (shattered nose, multiple surgeries, fractured eyeball, TMJ, depression, scarring).

before us, this Court extends the maximum amount of potential damages to $500,000. Thus, the damages awarded for pain and suffering, as well as scaring and disfigurement are hereby adjusted to $500,000.

Finally, we address the award for past medical expenses. Awards for past medical expenses are capped at the amount actually billed. *Jones v. Hyatt Corp. of Delaware*, 94-2194, p. 14 (La. App. 4 Cir. 7/26/95), 681 So. 2d 381, 389; *See Young v. Logue*, 94-0585, p. 42 (La. App. 4 Cir. 5/16/95), 660 So. 2d 32, 59–60 (Wherein this Court reduced an award of $300,000 for combined past and future medical expenses by itemizing past medical damages based upon the bills introduced into evidence and lowered future medical expenses based on the amount of past medical expenses). Appellant submitted medical bills, receipts, and cancelled checks totaling $78,658.04 in past medical expenses. The jury awarded Appellant $75,000.00 for past medical expenses. The maximum amount Appellant can receive for past medical expenses is $78,658.04, based upon the testimony and evidence presented to us in the record. There is no explanation or justification as to why the jury awarded less than the maximum proven and undisputed at trial. Thus, we believe that the jury award is likely the result of a mathematical miscalculation by the jury. "Appellate courts have the power to correct errors in calculation in judgments of the district court, which could have been corrected if brought to the notice of the court below." *Growe v. Johnson*, 2020-0143, p. 9 (La. App. 4 Cir. 2/17/21), 314 So. 3d 87, 95 (quoting *Trane Co. v. Bellevue Baptist Church of Metairie*, 233 So. 2d 13, 15 (La. App. 4th Cir. 1970). Accordingly,

Appellant is entitled to past medical expenses in the amount of $78,658.04. In light of the evidence in the record before us, we find that the award of $75,000 for past medical expenses was a mathematical error. Therefore, the damages awarded for past medical expenses are hereby adjusted to $78,658.04.

## Conclusion

For the foregoing reasons, we find the trial court committed manifest error by not following the standards set out in *Posecai*, and therefore, erroneously granted the judgment notwithstanding the verdict. We further find the allocation of fault to be as follows: Appellant - zero percent (0%); Appellee – fifty percent (50%) and the unknown assailants – fifty percent (50%). We find the jury's damage awards were an excessive amount and an abuse of discretion, and adjust Appellant's damages to the following: $40,000 for mental anguish, $500,000 for physical pain and suffering, as well as scarring and disfigurement, and $78,658.04 for past medical expenses, for a combined total award of $618,658.04.

Considering the foregoing, we hereby reverse the trial court's granting of the judgment notwithstanding the verdict and remand the case for the issuance and entry of a judgment in favor of Appellant, against Appellee and the unknown assailants in accordance with the directives contained in this opinion.

**REVERSED AND REMANDED**